GRIEVANCE COMMITTEE vs. GEORGE H. ENNIS.

Third Judicial District, New Haven, June Term, 1911.

HALL, C. J., PRENTICE, THAYER, RORABACK and WHEELER, Js.

While a large measure of discretion is vested in the Superior Court in passing upon the alleged misconduct of an attorney at law upon charges preferred against him by the grievance committee, its action is nevertheless reviewable by this court on appeal, and will be set aside if it clearly appears that the facts found are insufficient in law to sustain an order of suspension.

A statement made by an attorney to his client after being told how her injury occurred, to the effect that he could obtain a large sum of

Grievance Committee *v.* Ennis.

money for her, is not necessarily false nor unprofessional. He may well have believed at that time that she was entitled to large damages.

An instruction, given in good faith, by an attorney to his client, not to settle privately a claim for personal injuries, is proper and professional.

The sum which an attorney ought to charge for his services in a case for damages for personal injuries is largely a matter of opinion; and even if he should charge more than double what the trial court might think was proper, his conduct would hardly merit suspension from practice, if he acted in good faith, at least not until he had refused to return the sum overcharged.

An attorney's charge for professional services may be said to be extortionate only when it is an oppressive or illegal exaction; and therefore a charge in good faith, made pursuant to the terms of a valid contract with the client, cannot be said to be extortionate.

A contract for a contingent fee of fifty per cent. of the amount recovered in an accident case is not necessarily unfair, extortionate or illegal. Undoubtedly such contracts are not to be encouraged, but there may be instances in which they may be justified, provided they are made with perfect fairness and without taking any advantage of the ignorance or necessities of the person requiring the attorney's services.

Such a contract for the services of an attorney made by a minor, though voidable is not illegal, especially if the circumstances under which it was made do not warrant the inference that the attorney was actuated by any corrupt motive or that he intended to take any unfair advantage of the minor.

Unless restricted by statute a guardian has the power, while acting in good faith and not contrary to the order of the Court of Probate, to compromise a claim of his ward which he is satisfied cannot be recovered by litigation.

Upon proceedings to suspend an attorney from practice for unprofessional conduct in charging a large contingent fee, the question is not whether the client is entitled to some part of the sum so retained by the attorney, but whether the attorney should be disbarred for charging such sum.

The mere failure of an attorney, while negotiating for the settlement of a claim, to reveal to the other side the weakness of the evidence of his own case, especially when dealing with those who know all the facts, is not a wrongful concealment of evidence, nor such professional misconduct as warrants his suspension from practice. Moreover, such concealment, if relied upon as a ground of suspension, must be alleged in the charges preferred against the attorney.

The defendant, an attorney at law, was requested to call upon one *S,* a Russian girl of nineteen, who had been injured while working

Grievance Committee *v.* Ennis.

in a factory. He did so, and in the presence of an interpreter and three of her relatives she described the accident and asked the defendant if he would take her case and what his charges would be. He replied that he would act for her and would charge her reasonable counsel fees as the work progressed. Thereupon *S* and her relatives said that they had no money to pay him in that way, and upon his suggestion they agreed to pay him a contingent fee of one half the amount recovered, he having stated he would be able to obtain a large sum. He also told *S* not to settle with her employer, as he could get more if the matter was left in his hands. Shortly thereafter he was, by her request, appointed her guardian for the purpose of bringing suit or adjusting her claim. Later investigation convinced him that the injuries of *S* were due to her own negligence, and thereupon he informed her that there was no chance of recovering anything by suit, and obtained her authority to use his own judgment in effecting a settlement. *S* and her relatives supposed that any offer would be reported to them before it was accepted, but such understanding was not justified by any conduct of the defendant. At one or more interviews with the employers of *S*, the defendant told them that he had a written statement from one of the witnesses (which was true) and that such witness couldn't very well go back on that, but did not say what the statement was, and talked as though he had a good case for substantial damages. The employers, who professed to know all about the accident, offered $500 to settle, which the defendant accepted, retaining $250 himself and depositing the balance in a savings-bank to the credit of *S*, who refused to take the bank-book when tendered. *Held* that such conduct, while open to criticism perhaps in some of its aspects, was nevertheless not illegal or corrupt, and did not warrant a judgment of suspension.

This court will treat statements in the draft-finding which are marked "proven" as part of the trial court's finding; and therefore a request for such correction of the finding is superfluous and irregular.

Argued June 13th—decided July 31st, 1911.

COMPLAINT against the defendant, a member of the Fairfield County Bar, for professional misconduct in exacting an extortionate fee from his ward and client, brought to and tried by the Superior Court in said county, *Burpee, J.;* facts found and judgment rendered suspending the defendant from practice in this State for the period of two years, from which he appealed. *Error; judgment set aside.*

The complaint of the Grievance Committee, dated

June 20th, 1909, and filed in the Superior Court
July 15th, 1909, alleges that in February, 1909, one
Nellie Shuster, a Russian girl, nineteen years of age,
and unable to speak or understand English, employed
the defendant, an attorney at law, to prosecute a claim
against the Warner Brothers Company of Bridgeport
for an injury she had sustained while in its employ; that
understanding from the statement of the defendant
that he could procure for her several thousand dollars,
and that she was not to accept any sum said company
might offer in settlement of her claim, she agreed that
said attorney should receive for his services one half of
the amount he might obtain; that the company there-
after offered her $300, which she refused; that upon his
application, and at her request, the defendant was ap-
pointed her guardian; that he advised a conference with
the company with a view to settlement, promising that
before accepting any settlement he would report to her;
that afterward, without reporting to her, and without
authority from the Court of Probate, he settled the
claim for $500, retained $250 for his services, and of-
fered Miss Shuster the remaining $250, which she re-
fused; that the sum so retained by the defendant for
his services was "excessive and unjust, and his agree-
ment with his said ward as to his fee was improper."

To this complaint the defendant filed a special an-
swer stating the circumstances of his employment by
Miss Shuster, and of the settlement of the claim, all of
which averments were either admitted by the reply of
the State's Attorney, who prosecuted the complaint in
the Superior Court, or were practically found true upon
the trial.

The facts, stated either in the finding of the trial
judge or in the paragraphs of the draft-finding marked
"proven," were in substance these: March 23d, 1909,
Miss Shuster, a minor and a foreigner who did not

speak English, through her sister and brother-in-law, requested one Neikind, an interpreter, to bring the defendant to her said brother-in-law's house in order that she might consult him as to obtaining redress from the Warner Brothers Company for an injury she had sustained while in their employ. In compliance with such request the defendant visited Miss Shuster, who was then confined to her bed from said injury, and she, through said interpreter, and in the presence of her brother, sister, and brother-in-law, told the defendant how she was injured, and that it was while doing an act directed by the forewoman of the room in which she was working, and that many of her associates would testify that she was so directed to do said act. During the interview Miss Shuster, through the interpreter, asked the defendant if he would take the case, and if so what his charges would be. He replied that he would take the case "upon the payment to him of reasonable counsel fees as the work progressed." Miss Shuster, her brother-in-law and sister, through the interpreter, replied that "they had no money to pay him in that way." Thereupon the defendant, through the interpreter, "suggested he would take the case upon her giving him one half of all the money he could obtain from the Warner Brothers Company." To this proposal they, including Miss Shuster, agreed, through said interpreter. The defendant said he would bring a suit for $5,000 or $10,000 and obtain a large sum, and said agreement was made with that understanding. The defendant told Miss Shuster not to accept any offer of settlement, as he could get more if it was left to him. Miss Shuster and her relatives promised to obtain the names, and presence at said house, of witnesses in her behalf.

On the 31st of March, 1909, the defendant, upon an application signed by Miss Shuster, was appointed by

the Court of Probate her guardian for the purpose of bringing suit or adjusting her claim.

In April the defendant visited Miss Shuster to interview witnesses, but none appeared, nor were the names of any given to him. A few days later, he met at said house one Victoria Novak, who had been obtained by Miss Shuster and her relatives as a witness, who, after a long conversation, informed the defendant that the injury to Miss Shuster was caused by her disobedience of the order of the forewoman and the rules of the factory, and said Victoria Novak gave to the defendant a written statement in her own language of how the accident occurred. No other witnesses in behalf of Miss Shuster, nor the names of any, were furnished the defendant.

Both Mr. Warner and Mr. Greenman of the Warner Brothers Company, at an interview with the defendant, informed him how the accident occurred, and that it was from the negligence and disobedience of orders by Miss Shuster. Mr. Greenman told him that the Warner Brothers Company always desired to act fairly with their operatives, and asked the defendant how much he would settle for. He replied that he would have to consult with his client before naming any amount. The company's doctor, who had attended Miss Shuster, had said to her that the company would probably give her about $350 or $400, if she would accept it in settlement of her claim. In accordance with the instructions from the defendant she refused to make such settlement.

Paragraph 23 of the finding of facts states that in the course of his conversation with Mr. Greenman, the defendant told him that he "had obtained a written statement from the interpreter," and that "he had her in writing, and that she couldn't very well go back on that, and while he concealed the real contents of that

statement, he talked of his case as if he could prove it according to the version given to him by Nellie Shuster, and as if it was one to be considered only on the basis of substantial damages, and intimated and insinuated that he could show that her forewoman had instructed and ordered Nellie Shuster to get into the dangerous position in which she was hurt, and he intended and tried to make the superintendent so believe."

At a later interview with Mr. Warner, the defendant repeated to him the statements which he had made to Greenman.

Paragraph 13 of the defendant's draft-finding, marked "proven," and referring to said interview with Greenman, is as follows: "In the course of said conversation with said Greenman, the appellant [the defendant] told him that he had a written statement from the interpreter, and she couldn't very well go back of that. Appellant [defendant] did not tell Greenman what the statement contained. The statement referred to was the statement made by Victoria Novak. . . . Aside from this there was no evidence that the appellant [defendant] made any false pretenses in his negotiations for settlement with relation to any evidence which he claimed he had."

Before said interviews the defendant had become convinced that Miss Shuster's injuries were caused by her own negligence and misconduct, and that the Warner Brothers Company was not legally liable therefor.

After his said interview with Greenman, the defendant again visited the Shusters and asked them if they had found any other witness or evidence, and when they replied they had not, told them there was no chance of recovering by suit, and asked for authority to make a settlement, and to use his own judgment in the matter. After discussion among themselves they said they had

confidence in him, and gave him the authority to settle which he asked for. The Shusters understood that any offer of settlement would be reported to them before it was accepted, but such understanding was not justified by any conduct of the defendant.

Two days later, at the interview above referred to, Mr. Warner offered the defendant $500 in settlement, which he accepted. The defendant retained $250, and deposited the remainder in a savings-bank for Miss Shuster's benefit, and offered her the bank-book, which she refused to accept.

August 12th, 1909, the defendant presented to the Court of Probate his final account as guardian, in which he included a payment to himself for services as attorney for his ward's estate of $242.20, and of probate fees of $7.80. February 7th, 1910, the Court of Probate made an order disallowing the item of $242.20.

The defendant was occupied in the service of his client on twelve or thirteen different occasions, and so spent about forty hours of time.

The finding states that the trial court reached these conclusions: "In his dealings with his client and in his conduct of her case the defendant has been guilty of both professional and non-professional misconduct. In his treatment of his ward the defendant was unfair and extortionate, and disregarded the obligation of his trust."

The judgment-file states, among other things, that the court finds all the material allegations of the complaint to be proved and true; that "the agreement between the defendant and his minor client as set forth in the complaint, under the circumstances disclosed, was unfair, extortionate and illegal," and that in his treatment of his ward, and "in his dealings with his client and her employer," the defendant "has been guilty of both professional and non-professional misconduct."

The memorandum of decision says, among other things: "In his own testimony concerning these allegations [of the second defense] it appears that the defendant accomplished that result [the settlement] by means of concealment and false pretenses relating to certain evidence which he claimed he had and could produce in a suit he was threatening to bring."

The appeal alleges, in substance, that upon the facts above stated the Superior Court erred in rendering a judgment of suspension against the defendant, and asks for various corrections of the finding, for which purpose the entire evidence is certified to this court.

*John J. Phelan, John W. Banks* and *George H. Ennis,* for the appellant (defendant).

*Stiles Judson,* State's Attorney, for the appellee (plaintiff).

HALL, C. J. Section 459 of the General Statutes provides that the Superior Court may suspend or displace attorneys for just cause. We have said that while a large measure of discretion enters into the action of the court in the exercise of this power, such discretion is not an absolute, but a reasonable one; that the power is one which is always to be used with moderation and caution; that the accused attorney is entitled to notice of the charges against him, to a fair hearing, and a fair determination, in the exercise of a sound judicial discretion, of the questions at issue, and to an appeal to this court for the purpose of having it determined whether or not he has in some substantial manner been deprived of such rights. *In re Durant,* 80 Conn. 140, 147, 150, 67 Atl. 497.

One way by which charges against attorneys at law for acts of misconduct, not committed in the actual presence of the court, may be brought before the Su-

perior Court for investigation, is provided by chapter 120 of the Public Acts of 1907, p. 673, and by the rules of court. Practice Book (1908) p. 206, § 10. The method there provided is the one adopted in the present proceeding. It contemplates a presentment to the Superior Court by the Grievance Committee, the State's Attorney, or a member of the bar, by written complaint describing the offense or offenses charged; due service of such presentment and complaint upon the accused attorney; a prosecution of the same by the State's Attorney of the county, or by other proper officer or attorney appointed by the court; and a fair trial and determination by the court of the matters in issue.

The statute and rules contain no further provision regarding the pleadings than that the accused may make any proper answer.

In the present case the parties were very properly permitted to frame issues in accordance with the general rules of pleadings.

In considering whether the judgment rendered by the Superior Court was justified, we should inquire what acts of misconduct can be said to be charged in this complaint as grounds for the suspension or displacement of the defendant from the office of attorney, and what facts have been found proved as the basis of the judgment of suspension.

First, it may be said to be charged that the defendant represented to Miss Shuster that he could obtain for her a large sum of money. It is neither alleged nor found proved that such statement was not made in good faith. From the nature of Miss Shuster's injury, and her statement to him of how the accident happened, he may well have believed that she was entitled to large damages. He had not then learned that her story was false.

Next, it may have been intended to charge that it was

misconduct on the part of the defendant to instruct Miss Shuster not to accept any settlement from the Warner Brothers Company, and to have thus prevented her from obtaining the $300 alleged to have been offered her by the company.

An instruction, given in good faith by an attorney to his client, not to privately settle with the opposing party a claim such as that which the defendant was employed to prosecute, is proper and professional. Generally the attorney is supposed to be better able to conduct negotiations for the settlement of such a claim than the client. There is no averment that such instruction was not given in good faith, nor does the finding show that Miss Shuster ever received any authorized offer of settlement.

Next, it is alleged that the defendant accepted $500 in settlement of the claim without authority, and without reporting the offer of such settlement to Miss Shuster.

It is neither alleged nor claimed that the sum paid by the Warner Brothers Company was less than the amount Miss Shuster was entitled to receive or than could have been recovered by suit, or than the company might have been induced to pay by way of settlement, or that the interests of Miss Shuster were in any way betrayed by such settlement. In fact, in so far as the merits of Miss Shuster's claim are shown by the finding, the settlement made appears to have been a very favorable one for her.

The averment that the defendant promised to report any offer of settlement to his client before accepting it, is clearly disproved by the facts found. It appears that he was given permission to make a settlement and use his own judgment in the matter, and that he had no reason to suppose that he was expected to report any offer of settlement before accepting it.

It is charged that the sum of $250 retained by the defendant for his services from the $500 received in settlement was excessive and unjust. Had there been no special agreement regarding his compensation, we think it might very properly have been found, upon the facts before us, that the charge of $250 for obtaining $500 by way of settlement of his client's claim, and without suit, was excessive. But we have no certain test by which we can determine the precise sum which an attorney ought to charge for his services in a case of this character. It is largely a matter of opinion, and if an attorney should in good faith charge $250 for legal services which a court should find were worth less than half that sum, while such decision might be a sufficient reason why the attorney should not retain the entire sum charged, it would hardly be a sufficient reason for disbarring or suspending him from practice, at least until he refused to return the sum overcharged.

But in charging $250 for his services, the defendant evidently relied upon his right to do so under his agreement with his client, irrespective of the value of his services; and the finding fails to show that in so doing he acted corruptly or in bad faith, unless it is shown by the conclusion of the court, stated at the close of the finding, that his conduct was "unfair and extortionate," or by the statement in the judgment-file that the agreement between the defendant and his minor client was "unfair, extortionate and illegal."

An attorney's charge for professional services may be said to be extortionate when it is an oppressive or illegal exaction. Century Dictionary and Cyclopedia. In law, the obtaining or detention of money, *colore officii,* which is not legally due, is extortion. *Preston* v. *Bacon,* 4 Conn. 471, 480. A charge made in good faith by an attorney for professional services, made in compliance with the terms of a contract with his client which is not

illegal, cannot be said to be extortionate. Unless the contract in compliance with the terms of which the defendant's charge for services was made was illegal, the conclusion of the trial court, that the charge was unfair and extortionate, is not sustained by the subordinate facts of the finding.

The complaint does not charge that the contract between the defendant and his client was illegal, but only that it was improper. The State's Attorney admits in his brief that contracts for a contingent fee of fifty per cent. of the amount which may be recovered, when nothing is to be paid in case of failure, are not necessarily unfair, extortionate, or illegal. His claim in his brief is that this agreement for the retention of one half the sum recovered, irrespective of the amount or the labor or learning required to collect it, was so "inelastic," and made under such circumstances, as not to be binding on the client.

We have no thought of encouraging or expressing any approval of a practice by attorneys of obtaining employment in accident cases by agreeing to accept for their services a large percentage of the sum which may be recovered, and to make no charge for their services in case of a failure to obtain damages. Such a method of practicing the profession of law we think is generally and justly condemned by the bar, and contracts so made should always be closely scrutinized by the courts, and set aside when found to have been procured by fraud, undue influence, or imposition. "The poverty of a client may never justify a lawyer in purchasing an interest in the subject-matter of the litigation, or in stipulating for an extortionate fee on the basis of a wagering percentage of its profits." Code of Professional Ethics of State Bar Association of Connecticut, 82 Conn. 708. There are undoubtedly cases when the poverty and necessities of the client may

justify an attorney in accepting employment upon a large contingent fee, and a contract for a contingent fee of fifty per cent. of the sum to be recovered upon a claim such as that of Miss Shuster is not necessarily illegal because it is contingent and indefinite, or because it may be much more than compensatory for the services afterward rendered, provided always such contract is made with perfect fairness, and no advantage whatever is taken by the attorney of the ignorance or necessities of the person contracting for his services. *Stanton* v. *Embrey*, 93 U. S. 548, 557; *Taylor* v. *Bemiss*, 110 U. S. 42, 3 Sup. Ct. Rep. 441; *Perry* v. *Dicken*, 105 Pa. St. 83; *Fellows* v. *Smith*, 190 Pa. St. 301, 42 Atl. 678; *Morehouse* v. *Brooklyn Heights R. Co.*, 185 N. Y. 520, 78 N. E. 179; *Reece* v. *Kyle*, 49 Ohio St. 475, 487, 31 N. E. 747. Whether or not such contracts are fair and free from imposition is frequently to a considerable extent a matter of inference from the age, inexperience, or ignorance of the client, the character of the claim to be prosecuted, the services which may be required, and the amount of the fee which is demanded. *Morehouse* v. *Brooklyn Heights R. Co.*, 185 N. Y. 520, 78 N. E. 179.

The fact that Miss Shuster was a minor did not render her contract illegal. Contracts of infants are for the most part not void but only voidable, and especially when they may be for the infant's benefit, as this contract may have been. *Kline* v. *Beebe*, 6 Conn. 494, 502.

In the case before us it is not found, and the facts do not warrant the inference, that the defendant either in making the contract for the contingent fee, or in his subsequent conduct in collecting the $500, was actuated by any corrupt motive, or that he contracted for the payment of a fee, or charged a fee, which he believed was illegal, or that he intended to take any unfair advantage over Miss Shuster. Ennis did not solicit the

employment as attorney for Miss Shuster, but was sent for by her. The subject of his employment and of the fee he was to receive were openly discussed at an interview with her, in the presence of her brother, her brother-in-law, and sister, and an interpreter, and these relatives took part in the discussion. The defendant apparently had no reason whatever to believe that Miss Shuster and her relatives did not fully understand the agreement that was made. It was probably at first understood that Ennis was to bring an action. When it was learned that Miss Shuster's statement of how the accident happened was incorrect, and that witnesses to sustain her claim could not be obtained, it was fully understood that what the defendant could collect would be by way of such settlement as he could procure to be made by the Warner Brothers Company, and to this arrangement Miss Shuster assented.

That the defendant as an attorney in good faith effected a settlement of the claim favorable to Miss Shuster, but without having as guardian obtained the authority of the Court of Probate, and that that court refused to allow the item of $242.20 in the guardian's final account, are not sufficient reasons for suspending the defendant from practice as an attorney. Unless restricted by statute, a guardian has the power, while acting in good faith and not contrary to the order of the Court of Probate, to make such a compromise. *Ordinary* v. *Dean*, 44 N. J. L. 64; *Smith* v. *Angell*, 14 R. I. 192.

That the Court of Probate adjudicated the defendant's charge improper, and refused to allow that item of his final account, was not a matter referred to in the complaint. In fact, the order disallowing this item was not made until more than six months after the complaint of the Grievance Committee was filed in the Superior Court. And it is to be remembered that the question

in this proceeding is not whether Miss Shuster is entitled to receive from the defendant some part of the sum he retained, but whether he should be suspended for charging such sum.

The judgment-file indicates that the order of suspension was to some extent based upon the claimed misrepresentations and concealment of evidence by the defendant at his interviews with the superintendent and with the secretary of the Warner Brothers Company. Of course, an attorney is never justified in making wilfully false representations regarding the evidence in his possession, for the purpose of procuring the settlement of a claim which he is employed to prosecute. But the mere failure on his part, while endeavoring to obtain such a settlement without suit, to reveal to his adversary the weakness of the evidence in his possession, and especially when dealing with persons who well knew the facts of the case and what the witnesses would testify to, can hardly be called a wrongful concealment of evidence, or such an act of professional misconduct as would justify his suspension. The statements of paragraphs 23 and 26 of the finding are very materially modified by those of paragraph 13 of the draft-finding marked "proven." By the latter paragraph it is found that the defendant said that he had a written statement from the interpreter (and he had such a statement), and that she could not very well go back of that; that he did not say what the statement contained; and that aside from this there was no false pretense regarding the evidence which he claimed to have. The defendant very likely induced the superintendent and secretary to believe that an action would be brought in case there was no settlement, and it does not appear that he did not have the intention to commence an action if no settlement was made. Mr. Warner and Mr. Greenman had investigated the facts and satisfied themselves

that the company could not be held liable. We do not think it appears that they were induced to pay money by any false pretenses or fraud of the defendant. To save the expense of defending an action they very likely paid a larger sum than they otherwise would have paid.

Another substantial reason why the claimed misconduct of the defendant in his dealings with the Warner Brothers Company should not be made a ground for an order of suspension, is that the complaint contains no such charge.

The request of the defendant to have the finding corrected by adding facts contained in paragraphs of the draft-finding marked "proven" is irregular. Such facts of the draft-finding are treated as parts of the finding of facts. *Waterbury* v. *Rigney*, 79 Conn. 60, 65, 63 Atl. 775.

Upon consideration of all the facts before us, we are satisfied that they are insufficient to support the order of suspension.

There is error and the order and judgment of suspension is set aside.

In this opinion the other judges concurred.