[S. F. No. 14989. In Bank.—April 30, 1934.]

FRANK E. KILPATRICK, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

690

Edwin V. McKenzie for Petitioner.

Philbrick McCoy for Respondent.

THE COURT.—Application is made for a review of the action of the board of governors of The State Bar of California in recommending the suspension of the petitioner from the practice of the law for a period of two years. On October 20, 1932, Frank E. Kilpatrick and Booth B. Goodman, his partner in the practice of law in Oakland, were served with a notice to appear before Local Administrative Committee No. 3 of Alameda County and show cause why they should not be disciplined for professional misconduct. The misconduct charged was in connection with the actions of *Katherine M. Baldwin v. The Peerless Stages System, a Corporation, and Harry Baker,* numbered 120,420, and *S. S. Baldwin v. The Peerless Stages System, a Corporation, and Harry Baker,* numbered 120,421, in which the firm of Kilpatrick & Goodman were attorneys for the plaintiffs. The charged misconduct consisted of violations of rule 15 of the Rules of Professional Conduct of The State Bar and of subdivision 5 of section 287 of the Code of Civil Procedure by the commission of acts involving moral turpitude, dishonesty and corruption. The charges were set forth in five counts, alleging: That Kilpatrick and Goodman secured King, a material witness whose testimony would tend to establish a material fact, to avoid service and secrete himself and sought to make his testimony unavailable by allowing their agents to keep him away from the trial and away from the representatives of the defendants in these actions; that, by and through

their agents, they took charge of King during the trial and prevented his attendance as a witness and prevented the defendants from procuring him as a witness, well knowing that he would prove to be a valuable witness for the defendants; that, knowing his testimony would prove favorable to the defendants if produced, the petitioner and Goodman attempted by their agents to advise King to testify falsely should he be called; that, subsequent to the rendition of judgment in the damage actions, and while a motion for new trial was pending, they sought to procure from King an affidavit to the effect that he knew nothing about the facts involved in the actions, although they well knew that he had knowledge of the facts and if produced would give testimony favorable to the defendants; and, that for the purpose of procuring King to absent himself from the trial Kilpatrick and Goodman, through their agent, offered King the sum of $200 and thereafter paid him $77 for remaining away and secreting himself, and that they further offered to pay him if he would refuse to sign any affidavit produced by the defendants in their efforts to secure a new trial.

The local committee was of the opinion that the charge against Kilpatrick was sufficiently established but that the charge against Goodman failed, and it therefore recommended that the charge against Goodman be dismissed but that Frank E. Kilpatrick be suspended for the period of three years. By a vote of eight to six the board of governors adopted the findings of fact of the local committee and recommended that Kilpatrick be suspended for a period of two years, the six dissenting votes being placed upon the ground that the corroborating testimony was insufficient.

The Baldwin actions arose out of a collision between the Baldwin Chevrolet and one of the Peerless Stages System busses. The trial began on Friday, January 22, 1932, and continued until Thursday, January 28th. There is some doubt whether King actually saw the accident, but, at any rate, he was on the spot immediately after it occurred and the next morning signed a statement, obtained by T. N. Hay, investigator for the bus company, which was definitely in favor of the driver of the bus on the question of negligence. Shortly thereafter he moved from Oakland, and at the time of the trial he was living in Saratoga but

was engaged in the operation of an automobile cleaning and paint shop in San Jose. Both sides had been trying to locate him but neither was successful until Monday, January 25th, the second day of the trial, when Nimmo, the investigator for Kilpatrick & Goodman, found him at his paint shop and interviewed him there. So far there is practically no conflict in the evidence, it being conceded that up until this interview Nimmo could not have known what the testimony of King would be. But from this point on the stories of King and Nimmo vary greatly. King's story being that, after learning what his testimony would be, Nimmo told him that he would be well paid if he kept away from the trial or if he would "forget" about the accident if he were subpoenaed by the defendants. On the other hand, Nimmo insists that he regarded King's testimony as favorable to the plaintiffs and that all his activities were in furtherance of an attempt to persuade King to come to the trial and testify but that King was reluctant to do so, particularly because he had given Hay a signed statement contrary to the true facts which he excused on the ground of sympathy for the bus driver (and King has admitted that the reason he signed the statement was to save the bus driver's job) and also because he did not want to leave the shop he was just opening.

The report of the local committee points out that the hearing was extended and the testimony voluminous and incapable of complete reconciliation, the complainant King in particular being "indefinite and confused as to the order of time in which events occurred" but that nearly all material portions of his testimony with regard to dealings with Nimmo and Kilpatrick are corroborated by other witnesses, although there is some contradiction by reputable and apparently uninterested witnesses. But, "viewing the testimony as a whole, and disregarding some contradictions by apparently disinterested witnesses", the committee concluded that "Nimmo's activities were directed toward keeping King away from the trial rather than getting him to court as a witness; that Nimmo did promise King money for staying away and did pay him substantial sums for that purpose"; and "that the respondent Kilpatrick was entirely aware of what Nimmo was doing with respect to this matter".

King's testimony is substantially as follows: He signed a written statement the morning after the accident for an investigator of the bus company and signed it of his own free will and without compensation therefor and, with the exception of the dates, it is true. He first saw Nimmo in San Jose when he came to King's shop and said he was from Kilpatrick & Goodman and came to see about the accident. He, King, drew a diagram on the floor of the shop for Nimmo, whereupon Nimmo exclaimed, "My God, we can't have you in this!" Nimmo then took him out to lunch, at which time he asked him if there was not some way he could forget something about the accident and said he would pay him well if he would keep away from the trial. King later testified that Nimmo never at any time asked him to be a witness. On this same occasion Nimmo told King that the investigators for the bus company were looking for him and asked if they had seen him. King then told of the statement, but said he had seen no one since. He also told Nimmo he was going to Oakland in a day or so and Nimmo gave him his card and told him to call him when he got there and not to let "the boys" see him, referring to Jimmy Buck and one, Lydon, who are not identified. King went to Oakland the following day with his brother-in-law to look at a restaurant and telephoned Nimmo from there. He testified that Nimmo arrived about fifteen minutes later, alone in a Ford coupe, and that Nimmo gave him $10 and said he would see him later, but no conversation was had about the accident. (It seems to be conceded that King's trip to Oakland was on Tuesday of the trial.) The next day Nimmo came to Saratoga around 7 A. M. and inquired for King at the house of Mrs. Graham, a neighbor of King's who, with her husband, was interested in the San Jose shop and through whom King received his telephone messages. Mrs. Graham got King and he agreed to meet Nimmo in San Jose at the paint shop. At this conversation King told Nimmo he did not want to appear, and Nimmo said, "What would you do if we had to subpoena you?" King replied that he would tell the truth, and Nimmo asked if he could not "forget a lot of this" and King repeated that he would tell the truth if subpoenaed. Nimmo then insisted upon taking King to the office of Randall O'Neill, a lawyer in San Jose, who, he said, was a good friend of Kil-

patrick's. Nimmo talked with O'Neill first alone and then King asked O'Neill if he would get into trouble by staying away from the trial, and O'Neill said he would not if he were not subpoenaed. O'Neill further said that he knew Mr. Kilpatrick well and that Kilpatrick would back up whatever Nimmo said. King said he had not told O'Neill at the time of the offer to pay him and no mention of money was made at this interview, and in fact he later testified that the first definite offer of money was made on a subsequent occasion. King next saw Nimmo when he came to the home of Mrs. Graham at 8 o'clock that night (this would be Wednesday evening, according to King's version) and said the inspector from the bus company was coming down to see him and he wanted King to come and spend the night with him in a San Jose hotel. He told the Grahams he was taking King with him for the night and they all had a drink of whisky supplied by Nimmo. King was taken out and introduced to Kilpatrick, who was waiting in the car outside (Kilpatrick's car), and they all drove to San Jose where Kilpatrick was left at a hotel, Nimmo and King returning to the Grahams, where they had a party on liquor furnished by Nimmo. On the way in to San Jose with Kilpatrick nothing was said about the accident or King's testimony. There were present at the Graham home, the Grahams and King's two brothers-in-law, Smith and Barnett. The accident and King's value as a witness were the main subjects of conversation. Nimmo told them that he was going to take care of King, that they could win if he were kept away from the trial and that they would all have money when the trial was over. Nimmo thanked Mrs. Graham for answering the phone and said he would give her $50. On another occasion he is said to have promised her a motorcycle to be used in connection with the paint shop. Nimmo returned about 6 or 7 o'clock the next morning (Thursday) and told King the bus company investigators were in San Jose and not to wait for breakfast. He took King to Los Gatos for breakfast and then to Santa Cruz. On the way they discussed the accident, stopping for King to draw a map on the highway by Holy City, and Nimmo promised King "between $200 and $500" not to go to the trial or "know too much" if subpoenaed. Arrived in Santa Cruz, Nimmo telephoned the office from a gasoline

station and then went to a dairy where the Bohns (King's niece and her husband) worked. There they all discussed the trial and King's staying away from it, which Nimmo gave as the reason for their appearing so early in the morning. Nimmo then wanted to go to Livermore, but King refused. They reached Saratoga again about 2:30 in the afternoon. Mrs. Graham said two men had been to see King and described them. Nimmo said one was Mr. Licking, the attorney for the bus company. However, Hay said their first trip to Saratoga to see King was on the thirtieth day of January.

The next day (this would be Friday, January 29th) Hay and Licking came and asked King to sign the affidavit, which he refused to do, but made an appointment for noon the next day at the paint shop. The next day (Saturday) Nimmo arrived at the paint shop, and, having heard about the appointment with Hay, tried to get King to go to O'Neill's office to sign an affidavit to the effect that he knew nothing about the wreck, but on King's refusal, he asked him to go for a ride, and when he got him in the car took him to San Francisco, stopping at the Hood Tire Co. to see some men Nimmo knew, and then across the bay to Oakland about 4 o'clock. Nimmo said he had to go to the office and arranged to meet King on Twelfth Street about 5 o'clock. After that they went to Hayward and had dinner, then back to Saratoga, arriving about 8. King was called to the telephone, but Nimmo insisted on answering it for him. Nimmo said he was King, and then: "You fellows high-powered me into signing this statement, and I don't want another damn thing to do with it, so you might as well leave me alone". When he had hung up he said: "By God, I guess that will hold them." King said he did not ask Nimmo to answer for him.

A few days later Nimmo came down and said the case was won, and about three days after that he tried to get King to sign an affidavit to the effect that he knew nothing about the accident, saying it was to be used in case of a new trial. King refused. The next day King tried to call Nimmo from Saratoga to tell him someone had been trying to get in touch with him, but Nimmo was out and he talked to Goodman (which, of course, Goodman denies). Later Nimmo came and had his car washed and made another

attempt to secure an affidavit and said that the plaintiff had moved for a new trial. King said Nimmo promised him money at least six or eight times, that he gave him $10 in Oakland and $10 the *second* time they went to Santa Cruz, and $7 at Mrs. Graham's. King could not fix the time of the second trip to Santa Cruz and admits that $7 was the charge for washing and polishing Nimmo's car, but says that was paid at another time and place. Barnett testified to this payment, which was made in the evening in the driveway near his house. Nimmo on several occasions told King he would be paid as soon as the case was settled. In June or July King went to the office of Kilpatrick & Goodman, and Nimmo being out, he saw Kilpatrick. He asked for the rest of his $200 and said he had been paid only $27. Kilpatrick said he would have to wait and see Nimmo that afternoon as he understood he had been paid $150, but he finally agreed to pay him $50 and find out about the rest, and told King to come back at 3 o'clock and he would have it in cash, that he could not give him a check. This visit was in the morning and Barnett was with him. Barnett returned with him at 3 and Kilpatrick sent them into another office to see Nimmo; when Nimmo came in Barnett left and Nimmo paid King $50 and said he could have the rest in two or three weeks. After two or three weeks King went to see O'Neill and told him he had not received all his money. O'Neill reassured him, and some time later when King again went to see him with the same complaint O'Neill telephoned Kilpatrick at King's request and in his presence, and reported that Kilpatrick wanted King to go to Oakland and see him. King again went to Oakland, having a woman telephone because Kilpatrick was never in when he called. Kilpatrick being out and expected back about one, King and the lady went to the office about that time. Neither Kilpatrick nor Nimmo were in and they left a number for him to call. Nimmo finally called and said Kilpatrick would have nothing more to do with King. Thereafter King went to the office of another attorney in San Jose, to whom he explained the matter and who wrote Kilpatrick and Goodman demanding the remainder of the $200. Goodman replied to this letter in Kilpatrick's absence, saying that King had rendered them no services and had no money coming to him. King further testified that

he was advised by him to take the matter up with the Bar Association.

Frank E. Kilpatrick testified that the first he heard of King was from Nimmo when he had located him. He knew there was some man who had seen the accident and that Nimmo was looking for him. Nimmo telephoned and said he had found King and thought he would make a good witness, but he was reluctant to testify because of his previous statement and wanted legal advice. Kilpatrick telephoned Randall O'Neill and said he was sending King in to see him. Nimmo's instructions were to bring King in to testify and these instructions were never changed. All during the trial he was attempting to do so, and Kilpatrick, himself, made one trip to Saratoga for the same purpose. However, when he got there Nimmo told him in King's presence that it was all right now and King was coming so nothing more was said about King's testifying. He explains this by saying that Nimmo was an experienced investigator upon whose judgment both he and Goodman relied and that Goodman was handling the entire trial so that his purpose was merely to get King to come in so Goodman could talk to him and call him if he wanted to. Neither he nor the firm paid King any money, although he admitted that if Nimmo paid him he must have gotten it from him, Kilpatrick, or else out of his own pocket as he had no drawing account. He did not know the defendants were looking for King until after the trial, when Licking told him they were trying to get an affidavit for use on a motion for new trial. With regard to the firm accounts the testimony of both Kilpatrick and Goodman shows that the record of what was spent in connection with any one matter was extremely casual and there was a possibility that money spent on this case might not appear on the register of actions under this case or on the sheets submitted to the committee's inspection. Kilpatrick further testified that he saw King only once in his office at about 2 o'clock in the afternoon, that Barnett was with him but stayed outside in the reception room when King came into his office and that the door was closed. King asked for money, but did not ask for any particular sum or mention $27. Kilpatrick told him he did not owe him anything because he had not testified. As King left the office Nimmo entered the reception room and

King followed him into Goodman's office. Nimmo told Kilpatrick that King had said he wanted some of the money made in this case or he would make it hot for everyone. Kilpatrick denied sending King in to see Nimmo, denied he ever talked to O'Neill about paying King, and denied he had told Smith, examiner for The State Bar, that he had paid King $77 to testify, but King had failed to do so.

Randall O'Neill testified that he first heard of King when Kilpatrick telephoned and said he was having Nimmo bring him in to see him for legal advice. When they came, King's main concern was whether he would get into trouble by testifying contrary to a statement he had signed immediately after the accident to save the bus driver's job. He understood King wanted to testify for the plaintiffs. He did not assure King that Kilpatrick would stand back of Nimmo's promises, the first he heard of the $200 was several months later when King came in and said he had received $77 and had $123 coming. O'Neill at King's request telephoned Kilpatrick in King's presence and Kilpatrick said he owed him nothing. O'Neill then suggested to King that he go see Kilpatrick. This was not at Kilpatrick's suggestion but was his own idea. King, on cross-examination admitted having told Nimmo before he went to O'Neill's office that he would not do anything or go anywhere until he had had the advice of an attorney. O'Neill testified that King only came into his office with Nimmo once, he later came several times about money he claimed was due him. Nimmo asked O'Neill later to prepare an affidavit about the accident for King's signature but did not come back because King refused to sign it. He saw King a number of times (apparently in connection with King's shop) between the time he came with Nimmo and the time, several months later, when he first mentioned the money.

Steven Nimmo's story is that he was looking for King and knew the bus company were looking for him also, that he first found him on Monday, January 25th, at his wash rack in San Jose. He does not recall King's drawing a diagram but his impression was that his testimony was valuable to the plaintiffs, he tried to get King to go to Oakland but he was too busy getting his shop started, that he was also worried about the statement he had already made for Hay and in addition he did not want to appear

around the courthouse because he was wanted by the Oakland police on a check charge. He did not subpoena him because he was afraid of antagonizing him. King said several times he would go to Oakland but Nimmo did not get him there until Wednesday, January 27th, when the trial was almost over. He picked him up early in the morning of that day to take him to Oakland but King insisted on going to Santa Cruz and when he got there Nimmo let him out to see some people and when he came back he was practically drunk. King then insisted on going to San Francisco to a tire shop and when Nimmo finally got him to Oakland it was about 3:30 or 4 o'clock, he took King to the courthouse but Mr. Goodman was arguing a motion and could not use him then and told Nimmo to bring him to the office after court. This is substantiated by M. B. Moore, an attorney who had an office in the same suite as Kilpatrick & Goodman and who carried the messages between Goodman and Nimmo and saw King waiting in the car by the courthouse. Nimmo says he then left King at a barber-shop on Twelfth Street and when he came back for him he was in a speakeasy, drunk. Nimmo then reported to Goodman (who corroborated this part of his story) and told him he was through "chaperoning a drunk" and he considered King too unreliable to use anyhow. He then took King back to Saratoga arriving at about 8 P. M. He admits impersonating King over the telephone that same evening but says it was at King's request. Nimmo's story of the visit to Randall O'Neill's office and of Kilpatrick's trip to Saratoga are consistent with O'Neill's and Kilpatrick's. He says he only went to Santa Cruz once and that was at King's insistence, he places the Oakland trip on the same day. He says he never offered King money except for compensation for loss of time, he loaned him small sums out of his own pocket at various times, for instance, King borrowed $5 on the day he came to Oakland in order to go to San Francisco to buy equipment for his shop, but these sums did not amount to $27. He did not tell King to call him but King did so because he wanted money. On several occasions King told Nimmo the bus company had offered him $100. It is admitted that King tried to get a job with the bus company, interviewing the superintendent who first questioned him about the accident. Nimmo flatly

denies all the statements he is said to have made to King's relatives and friends about King's being a star witness for the defendants and paying him well not to appear. He says King would not sign an affidavit for the motion for new trial because he would not pay him to do so. Nimmo said that after the trial was over King came to the office and demanded money and threatened to make trouble and that he, Nimmo, threw him out. This story is substantiated by Fenton, an adjuster friend of Nimmo's who overheard the conversation in Goodman's office. Nimmo does not recall telephoning the office from the gas station on the Santa Cruz trip but he thinks he may have and thinks also he may have said that he had King with him and that he was drunk. Montell, who ran the service station, identified King, said he was in a car which he described as similar to Kilpatrick's with a man who made a long-distance telephone call to "May", saying: "I have him out here in the car driving around," that the man who telephoned then told Montell he had a man in the car who was drunk and whom he had to keep away from a trial in Oakland. He talked with King and saw him walk and he did not think he was drunk. All Kilpatrick's witnesses said that there was no one in the office named May.

The Bohns, Mrs. Graham and Barnett all substantiated King's story testifying to declarations of Nimmo about the trial, King's value as a witness and promises to reward him for keeping away from the trial and directions not to see anyone from the bus company. Mrs. Graham testified that King did not ask Nimmo to answer the telephone for him, she and Barnett both witnessed the drinking party at her house and Barnett substantiated King's story of the visit to Kilpatrick's office and of Kilpatrick's saying he thought King had received $150, but would give him $50 if he returned that afternoon. Barnett cannot, however, describe Kilpatrick's office at all and Mrs. Bowles, Kilpatrick's secretary, says King came in about 10 or 11 o'clock in the morning with a woman and asked for Kilpatrick or Nimmo, neither of whom were in, that he returned in the afternoon with a man and went alone into Kilpatrick's office and that the door was closed, that when he came out Nimmo was just coming in and King went with him into Goodman's office. All the witnesses who corroborate King are, with the excep-

tion of Montell, upon whose testimony the committee placed great weight, either relatives or closely connected with him, and while their testimony corresponds very closely with regard to many details, the comparative dates of the incidents which they relate are very confused, as they are by King himself. They all place these events in February or March, whereas they almost all occurred in January.

Hay testified that he first went to Saratoga in search of King on January 30th, when he saw Barnett who said King was in San Francisco. He did not see King until February 2, 1932, after the conclusion of the trial when he went with Mr. Licking to get him to sign an affidavit prepared in accordance with his signed statement which they wished to use in support of a motion for a new trial. Hay and Licking both testified that King was reluctant to sign the affidavit although he said his statement, a copy of which they gave him to read, was substantially correct. King said he wanted to consult with someone first. Both Hay and Licking suggested attorneys from whom he might get advice and Hay made an appointment to meet him at noon at his shop about three days later and get his decision. King did not appear at his shop at the appointed time or at all that afternoon and at 5:30 Hay telephoned him and got the message which Nimmo is said to have given him, although Hay is positive it was King talking. Thereafter, they made no further effort to obtain King's affidavit. Aside from this, Hay's only attempts to find King were a trip to Calistoga on January 25th and the trip to Saratoga on January 30th.

■ The main contention of the petitioner is that the evidence is insufficient to support the findings of the committee and we think this contention must be sustained. The findings against him rest almost entirely upon the testimony of King, aside from which there is little or no evidence tending to show his participation in or knowledge of the activities of Nimmo.

Were we able to give the testimony of King the weight which has been accorded to it by the majority of the members of the board of bar governors, not only would we feel that the recommendation made by the board should be approved, but we would be inclined to enter a judgment of disbarment. Conduct by an attorney such as that which is

the basis of the charge against the petitioner not only tends to impede the progress of litigation in the courts, but destroys that fairness with which litigation should be conducted. By his own testimony and that of others, the principal witness, King, has been shown to be extremely unreliable. For this reason, the recommendation of the board of bar governors, based upon the findings of the local committee, cannot be approved.

Nothing contained in this opinion is intended as a reflection or criticism of any of the acts or conduct of either of the San Jose attorneys consulted by either Nimmo or King, as apparently both of said attorneys acted in good faith and conducted themselves at all times herein referred to in a proper manner and in keeping with the dignity of the profession.

It is therefore ordered that the proceedings against the petitioner be, and they are hereby dismissed.