[S. F. No. 15401. In Bank.—September 30, 1935.]

EDMOND E. HERRSCHER, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

John L. McNab for Petitioner.

Joseph C. Sharp for Respondent.

Milton Newmark, John Francis Neylan and Bartley C. Crum, as *Amici Curiae* on Behalf of Respondent.

THE COURT.—The petitioner herein, Edmond E. Herrscher, has filed this proceeding for a review by this court of the findings of the Board of Governors of The State Bar, recommending his disbarment on three separate charges.

Herrscher was originally charged with five different acts of misconduct, all growing out of his relationship as attorney for Mr. and Mrs. James W. Perry, of New York. The local administrative committee that heard the evidence recommended the dismissal of three of the charges, found two of the charges sustained, and recommended Herrscher's disbarment. The Board of Governors agreed with the administrative committee as to the two charges found sustained by the evidence, but disagreed with the committee as to one of the charges which the committee had found to be without merit. The Board dismissed the other two charges.

In reviewing the recommendations of the Board of Governors in these disciplinary cases, the rule is now well settled that this court is not bound by the rule that findings based on substantial evidence are binding on an appellate court. In such proceedings, the Board of Governors acts as an administrative arm of this court and the court will approve or disapprove the Board's findings, depending upon the court's opinion as to the weight of the evidence. (*In re Shattuck*, 208 Cal. 6 [279 Pac. 998]; *In re Peterson*, 208 Cal. 42 [280 Pac. 124]; *In re Stafford*, 208 Cal. 738 [284 Pac. 670].)

Two of the charges upon which the Board based its recommendation of disbarment have to do with alleged exorbitant fees alleged to have been charged the Perrys by Herrscher, while the third charge involves an alleged secret profit made by Herrscher at the expense of the Perrys. Inasmuch as two of the charges involve the claim that the attorney has overcharged a client for services rendered, some reference must be made to the state of the law on that subject. There

can be no doubt that a gross overcharge can, under some circumstances, constitute an offense warranting discipline. In *Goldstone* v. *State Bar*, 214 Cal. 490, 498 [6 Pac. (2d) 513, 80 A. L. R. 701], this court stated the rule as follows:

"Although we are of the opinion that usually the fees charged for professional services may with propriety be left to the discretion and judgment of the attorney performing the services, we are of the opinion that if a fee is charged so exorbitant and wholly disproportionate to the services performed as to shock the conscience of those to whose attention it is called, such a case warrants disciplinary action by this court."

In that case, a workman, injured in an industrial accident, was ignorant of the fact that an award had been made in his favor. He consulted Goldstone, who examined the files of the commission, discovered the award and accompanied his client to the offices of the insurance company, and so collected the amount of the award, $882.96. For these services, Goldstone charged his client $310. The court held that the receipt of money as payment for services, when none have been in fact rendered, is a species of dishonesty which no court can condone. The court also emphasized that the client was ignorant of his rights and that the fee was so large in comparison with the slight service performed that it would shock the conscience of any to whose attention it was called. The Goldstone case was not one where reasonable men might differ as to the propriety of the fee, nor was it a case where the client was in a position properly to evaluate the services rendered.

We think the proper rule in such cases is that the mere fact that a fee is charged in excess of the reasonable value of the services rendered will not of itself warrant discipline of the attorney involved. Ordinarily, the propriety of the fee charged should be left to the civil courts in a proper action. (*People* v. *Robinson,* 32 Colo. 241 [75 Pac. 922] ; *Grievance Committee* v. *Ennis,* 84 Conn. 594 [80 Atl. 767] ; *People* v. *Pio,* 308 Ill. 128 [139 N. E. 45].) As was said by the Washington court in *In re Wiltsie,* 109 Wash. 261 [186 Pac. 848] :

"The board also found, as one of the grounds for his disbarment, that the charges made for these services were excessive. We do not feel like depriving a practitioner of his right to continue his profession on a question as debatable as

the propriety of the amount of a fee. Such a question is so much a matter of individual opinion that it should not be the basis for disbarment, except in the most aggravated and extreme case. So far as the record discloses, the fees were voluntarily paid, and, were it the only charge here that such fees were excessive, the extreme penalty would not be merited.''

In the few cases where discipline has been enforced against an attorney for charging excessive fees, there has usually been present some element of fraud or overreaching on the attorney's part, or failure on the attorney's part to disclose the true facts, so that the fee charged, under the circumstances, constituted a practical appropriation of the client's funds under the guise of retaining them as fees. (*State* v. *Barto*, 202 Wis. 329 [232 N. W. 553]; *State Board of Law Examiners* v. *Sheldon*, 43 Wyo. 522 [7 Pac. (2d) 226]; annotation 80 A. L. R. 706.)

Generally speaking, neither the Board of Governors nor this court can, or should, attempt to evaluate an attorney's services in a *quasi*-criminal proceeding such as this, where there has been no failure to disclose to the client the true facts or no overreaching or fraud on the part of the attorney. It is our opinion that the disciplinary machinery of the bar should not be put into operation merely on the complaint of a client that a fee charged is excessive, unless the other elements above mentioned are present.

With these preliminary remarks, we turn to a *résumé* of the evidence. The record here presented for review is an extremely bulky one, consisting of over 1300 pages of reporter's transcript and hundreds of pages of exhibits. Obviously, the reference to the facts must be brief.

Herrscher's first connection with the Perrys occurred in March, 1929. Perry, at that time, was a wealthy man, possessing a fortune of over a million dollars. For many years he had been connected with the Johns-Manville Company, starting in minor positions and ultimately becoming vice-president and director, at an annual salary of $36,000. In 1927, the company was reorganized and Perry was discharged. In 1928, he visited California and purchased extensive properties at Pebble Beach, where he started construction of an elaborate and expensive home. It was apparently the intent of the Perrys to make California their home. One factor

inducing them to come to California was undoubtedly their health. Mr. Perry was not in good health and Mrs. Perry was suffering from an apparently incurable malady known as Paget's disease. Another motivating factor, at least so far as Mrs. Perry was concerned, was to get Mr. Perry away from his New York mistress, with whom Perry had been intimate for many years.

On the 1929 trip, the Perrys sailed from New York on the S. S. Virginia, with a large retinue of servants and several relatives, in the best accommodations money could buy. Perry shipped his automobile on the same boat. En route, the Virginia stopped at Havana. Over the strong protest of Mrs. Perry, Mr. Perry purchased an assortment of liquor and placed the same in his automobile. When the boat docked in San Francisco, in March of 1929, someone reported the presence of the liquor in the car to the customs officials and the car was seized by the government. Perry tried through friends to get the car released, but was unsuccessful. He apparently feared prosecution under the Jones Act. He discussed his troubles with a person by the name of Macgrueder, a bootlegger, who was then supplying him with liquor, and Macgrueder recommended that Herrscher be retained. Herrscher testified that he knew Macgrueder socially, but did not then know that Macgrueder was a bootlegger. Perry requested Macgrueder to take the matter up with Herrscher, which was done. Macgrueder and Herrscher, at Perry's request, visited the latter at Pebble Beach. Several days later, Perry visited Herrscher, at the latter's office in San Francisco. Perry discussed with Herrscher the difficulties in which he was involved with the government, and also discussed his general affairs. He told Herrscher to get him out of his troubles and didn't care what it cost. On the next day, March 23d or 24th, Perry again visited Herrscher and definitely retained him. There is a dispute as to whether Herrscher was generally retained at that time or whether he was retained solely in the automobile transaction. The correspondence between Herrscher and Perry, and particularly the language used in the bills sent Perry by Herrscher, indicate that Herrscher was generally retained. We are inclined to believe that the weight of the evidence indicates that Herrscher was generally retained and was not retained solely in reference to the car. Herrscher immediately associated Sam Shortridge, Jr., and,

within a very short time, secured the release of the automobile, without criminal prosecution, upon Perry paying a $900 fine. Shortridge was paid $4,000 by Herrscher for his services, this sum being paid from the fees paid Herrscher. Immediately after securing the release of the automobile, Herrscher began personally to handle a multitudinous number of affairs for Perry. From March to October, 1929, Perry paid Herrscher a sum of money that is in dispute. The administrative committee found this sum to be, in accordance with Herrscher's testimony, $23,000, while the Board of Governors found this sum to be $28,000, in accordance with Perry's testimony. The dispute arose because the first payment of either $15,000 or $20,000 was made in cash. Herrscher's books for 1929 show that $15,000 was received. The charging of the $23,000 or $28,000 during this period, under the circumstances disclosed in the record, constitutes the first grounds of misconduct upon which the Board of Governors based its recommendation of disbarment. The local administrative committee found that, although the fees charged during this period were, in its opinion, ''excessive'', they were not so large as to be without ''reasonable justification'' and exonerated Herrscher on this charge. The Board also found that these fees were not only excessive, but were exacted from Perry at a time when Herrscher knew that Perry was mentally incompetent.

In November of 1929, the Perrys sailed for Honolulu on their yacht. Upon hearing of the stock market crash of that year, they left their yacht in Honolulu and returned to San Francisco. Perry lost heavily in the market and was mentally upset. Herrscher represented the Perrys from the time of their return to San Francisco until July 2, 1930. On that date, Perry was judicially declared incompetent and Mrs. Perry was appointed guardian of his estate. From July 2, 1930, until his employment terminated in 1931, Herrscher represented Mrs. Perry in her personal capacity and also in her capacity as guardian. In October of 1930, at a time when Perry was well on his way to recovery, Herrscher and his partner, Phillip Ehrlich, entered into a written contract with Mrs. Perry, both in her individual and representative capacities, whereby she agreed to pay them $50,000 for their services, which services were to continue until the termination of the guardianship. This contract and the payments

thereunder, as far as the guardianship was concerned, was expressly made subject to the approval of the superior court. Upon the execution of this contract, Mrs. Perry paid Herrscher and Ehrlich $18,000, and executed a promissory note in her personal and representative capacity for the balance of $32,000. The charging of this fee, under the circumstances disclosed in the record, was found by the Board to be excessive and constitutes the second charge upon which the Board based its recommendation of disbarment. No charges were ever filed against Ehrlich, although the record shows he was a party to the contract, was present when it was signed, and received half of the $18,000.

The third charge of misconduct is based on a furniture transaction with the Perrys, whereby Herrscher is alleged to have made a secret profit of over $4,000. The facts in reference to this third charge will be set forth in detail later in this opinion.

Before considering the merits of the above three charges, some reference must be made to certain collateral matters necessarily connected with the charges herein involved and necessary to be considered in appraising and weighing the evidence.

The record shows that for many years Herrscher had been retained by many substantial clients and had been accustomed to charging and receiving large fees for his services. In 1930, he had been retained by Fannie May Howard to represent her in a certain divorce proceeding against her then husband, Charles S. Howard, Sr., and in negotiations involving the adjustment of property rights amounting to over $20,000,000.

In October of 1930, after the $50,000 contract above mentioned had been entered into, the Perrys returned to New York. About this same time, Mr. Howard hired a private detective, one Eugene Kerrigan, to assist him in discovering anything that might be of advantage in the pending litigation. Kerrigan immediately undertook, on behalf of Howard, a most ruthless investigation of Herrscher. Dictaphones were installed in Herrscher's office and in his hotel rooms, and all conversations held therein were recorded. In some manner, not definitely disclosed in the record, Kerrigan or his operators secretly and without Herrscher's permission, entered Herrscher's offices on many different nights and made photostatic copies of Herrscher's personal and profes-

sional papers, including all papers, documents and letters pertaining to Herrscher's employment by the Perrys.

In the meantime, Perry, in New York, was regaining his health and sanity, although he had not yet been restored judicially to sanity. He became dissatisfied with the $50,000 contract above mentioned. In February of 1931, he and his wife visited San Francisco. They discussed their troubles with certain officials of the American Trust Company, and were referred by them to the firm of Brobeck, Phleger & Harrison, of San Francisco. These attorneys were retained by the Perrys to try to adjust matters with Herrscher. Howard Finn, of that office, was actively in charge of the case. Finn hired Kerrigan to check the Perry's story, which he testified sounded to him like "a dime novel". Finn testified that he did not know that Kerrigan was at that very time investigating Herrscher for Howard. Finn testified, as did Kerrigan, that Kerrigan refused to accept employment in the matter until he (Kerrigan) first secured permission from the firm of McCutchen, Olney, Mannon & Greene, the then attorneys for Howard, to turn over to Finn the documents he had secured as above mentioned while in Howard's employ. Upon this permission being secured, Kerrigan turned over to Finn all the information and material in reference to Perry that he had in his possession.

In the meantime, the Howard negotiations had reached a critical point. A property settlement agreement was pending. Herrscher heard of the arrival of the Perrys and of their desire to discharge him as attorney. He telephoned Finn and made an appointment to see him. He and Ehrlich called upon Finn at a time when Finn did not as yet have Kerrigan's files and offered to cooperate with him and to furnish to him all documents and files in their possession pertaining to the Perry employment. Herrscher was very busy with the Howard negotiations and retained Joseph Webb, San Francisco attorney, to represent him. Webb represented Herrscher in all subsequent negotiations with Finn. Finn threatened to take the Perry case to the courts. Herrscher felt, with some justification, that any difficulties with the Perrys might jeopardize the pending Howard settlement. Finn first demanded the return of the $18,000 received by Herrscher and Ehrlich in October of 1930 and the return of the $32,000 note. On the advice of Webb, these were returned. Herr-

scher also turned over to Finn certain stock certificates and other properties of the Perrys, properly in his hands as their attorney. Finn was not satisfied. He demanded the return of the $23,000 received by Herrscher in 1929. Webb offered to arbitrate the question of the reasonableness of the fees and offered to let Maurice Harrison act as arbitrator. Finn refused and stated that unless the fees were returned, he would start action. Webb advised against the return of these fees, but Herrscher insisted on returning them rather than to jeopardize the Howard settlement. It was during these negotiations, lasting several weeks, that it was discovered that Perry, in 1929, had paid about $9,000 for furniture, purchased through Herrscher's secretary, Miss Johnson, costing but $5,000. Thus a secret profit of about $4,000 had been made. Webb, William Hayes, office associate of Herrscher, Miss Johnson and Herrscher all testified that this was the first time that Herrscher knew of this secret profit. After some discussion about this secret profit, according to Webb's testimony, it was agreed to set off this sum against the $4,000 paid by Herrscher to Sam Shortridge, Jr., in the automobile transaction. Under these circumstances, Herrscher returned to the Perrys the full $23,000 received by him. Herrscher paid back the full $18,000 and the $23,000 out of his own pocket, although other attorneys had shared in these fees. The Perrys thus received back every cent they had paid Herrscher for about two years of legal services. The net result, as found by the local administrative committee, "has been a gross underpayment or no payment at all . . . for admittedly arduous and competently handled services". The committee also found that:

"In arriving at the foregoing findings of fact and conclusions, the committee has in no way given consideration to the intimation that the restitution by respondent of fees collected from the Perrys implied knowledge or belief of the impropriety of his conduct. As a matter of fact, the committee is of opinion that even at the hearing respondent saw nothing improper in the charges he made and exacted even from Mrs. Perry. His motive in restoring this money was purely and simply a practical consideration as to what would be the effect of publicity at the time upon the more important Howard litigation.

"On the other hand, the committee sees no ground for leniency in the fact this money has been restored and that the net result has been a gross underpayment or no payment at all to respondent, for admittedly arduous and competently handled services. This restitution was not made in the spirit of regret for a wrong done, or by reason of a desire to right an injury. It was made solely in the interests of expediency and under pressure. Respondent is not entitled to any credit therefor, and has received none in the recommendations here made."

We agree with these findings. No adverse or favorable inferences should be indulged as a result of the restitution of the moneys received:

After full restitution had been made, mutual releases were executed by the Perrys and Herrscher. The Perrys paid $7,000 to Brobeck, Phleger & Harrison and $2,500 to Kerrigan for their services, and returned to New York. Before leaving, they expressed to one noninterested witness their complete satisfaction with the result of their visit. They left, apparently completely satisfied, as well they might, having received about two years of legal services for nothing.

Within a few days after the Perry settlement was made Herrscher and his associate counsel settled the Howard case, Herrscher's client receiving a property settlement of about two and one-half million dollars. For his services in this case, Herrscher received $60,000. Kerrigan testified that upon the settlement of the Howard case and the securing of a divorce by Mrs. Howard, his employment with Howard, Sr., terminated.

Shortly thereafter, Herrscher left for a trip to Europe, accompanied by his mother and Mrs. Howard. It was rumored that upon Mrs. Howard securing her final decree she and Herrscher intended to marry. In October of 1931, while Herrscher was still in Europe, Mrs. Howard's sons, Lindsay Howard and Charles Howard, Jr., employed Kerrigan to renew his investigations of Herrscher, with instructions to gather evidence that might be used to prevail upon their mother not to marry Herrscher. Kerrigan again began his ruthless investigations, employing the same reprehensible methods above described. Apparently the only questionable transactions that these most intensive investigations disclosed involved the Perry relationship.

In March of 1932, while Herrscher was still in Europe, Perry, now judicially restored to sanity, returned to San Francisco. Although both Perry and Kerrigan denied it, the inference is clear that Perry made this trip at the instigation of Kerrigan and the Howards. Upon his arrival in San Francisco, Perry interviewed Howard, Sr., and Kerrigan. The next day, accompanied by Kerrigan, he visited the district attorney for the purpose of preferring criminal charges against Herrscher, based on the furniture transaction. Also accompanied by Kerrigan, Perry visited the offices of The State Bar and Kerrigan "aided" Perry in drafting the formal charges. In fact, after charges were filed with The State Bar, Kerrigan was the sole witness to appear before the preliminary committee of The State Bar, and it was upon his testimony alone that the formal charges forming the basis of this proceeding were made. All during this period, Kerrigan was in the employ of the Howard boys and was not being paid by Perry. The grand jury, through the intervention of Webb, refused to indict Herrscher during his absence and, upon his return and appearance before that body, dismissed the charge.

In the meantime, while Herrscher was still in Europe and after the grand jury had postponed consideration of Perry's charges until Herrscher's return, Kerrigan, still in the employ of the Howard boys, went to Europe with his photostatic copies of documents and records of conversations, and visited Mrs. Howard for the purpose of prevailing upon her not to marry Herrscher. Herrscher was present at the interview. Kerrigan disclosed to Mrs. Howard and to Herrscher the records he had and, according to Herrscher's testimony, threatened that if Herrscher continued with his plans to marry Mrs. Howard, he, Kerrigan, would have Herrscher indicted and disbarred. Kerrigan then returned from Europe and, while in New York, visited the Perrys. He returned to San Francisco in May of 1932.

After Herrscher returned from Europe, he and Mrs. Howard were married and are now husband and wife. Kerrigan testified that his employment by the Howards terminated upon his return from Europe. He, however, continued his activities in investigating Herrscher. He testified that, after his employment had ceased with the Howards, he continued his activities not from any desire to assist his former clients

(who are alleged to have paid him $30,000), but because his investigations had disclosed to him that Herrscher was not a proper person to be a member of the bar, but was, in fact, a menace to society, and that he desired to assist the bar in cleansing its ranks of one he considered unfit. In this regard, we are heartily in accord with the following finding of the local administrative committee:

"The committee is not impressed with the sincerity of Kerrigan's statement that his activities in this matter were influenced by his desire to do the bar a service by purging it of one, who in his opinion, was an unworthy member. It is the committee's opinion Kerrigan's activities were mainly induced by his desire to do a good job for those who, for the purpose of prevailing in their personal desires and for the purpose of securing personal gain and advantage, employed him and paid him large sums of money to harass respondent and to frustrate his objects."

After formal charges had been voted against Herrscher by the preliminary investigating committee of The State Bar, the examiner of The State Bar, in order properly to present his case, advised with Kerrigan and secured from him the records in his possession pertaining to the Perry deal. During the trial before the local administrative committee of The State Bar, the examiner properly conferred with Kerrigan. Except on possibly two occasions, none of the photostatic copies of documents secured by Kerrigan in the reprehensible fashion above described were directly introduced into evidence. However, the examiner made free use of these documents. The record shows that on many occasions he would demand of Herrscher the presentation of documents, the existence of which could be known only because of his familiarity with the documents in Kerrigan's possession. The illegally secured documents were, therefore, used in this proceeding. It should be added that Herrscher freely placed his files and books at the disposal of the examiner and the committee. The examiner is entitled to the highest praise for his able handling and fearless presentation of this case. As was his duty, he presented all the evidence against Herrscher that was available to him, including the information gained from Kerrigan, leaving it to the trial committee to determine the admissibility of such evidence. The trial committee determined that such evidence was admissible. We agree with

this determination. It is our opinion, that as a matter of law, such evidence, no matter how secured, is legally admissible. Whatever may be the rule in other jurisdictions; in this state the rule is clear that evidence, even illegally secured is admissible. In *People* v. *Mayen,* 188 Cal. 237, 242 [205 Pac. 435, 24 A. L. R. 1383], the reason for the rule is stated as follows:

"Without at all minimizing the gravity of such offense, or the sacredness of the right of every citizen to be secure in his person, home, and property from any unlawful invasion by the state, it does not follow that the subsequent detention and introduction in evidence of the property thus wrongfully taken constituted error on the trial of the appellant.

"The trespass committed in the wrongful seizure of these personal effects by unauthorized officers, and the subsequent use of the same in evidence on the part of the prosecution, were in legal effect entirely distinct transactions with no necessary or inherent relation to each other. . . .

"There is no rule better established or more universally recognized by the courts than that where competent evidence is produced on a trial the courts will not stop to inquire or investigate the source from whence it comes or the means by which it was obtained."

And again, at page 251, it is stated:

"The constitution and the laws of the land are not solicitous to aid persons charged with crime in their efforts to conceal or sequester evidence of their iniquity. From the necessities of the case the law countenances many devious methods of procuring evidence in criminal cases. The whole system of espionage rests largely upon deceiving and trapping the wrongdoer into some involuntary disclosure of his crime. It dissimulates a way into his confidence; it listens at the keyhole and peers through the transom-light. It is not nice, but it is necessary in ferreting out the crimes against society which are always done in darkness and concealment."

In approving the using of such evidence in this case, this court does not approve or condone the reprehensible and nefarious acts employed in the securing of such evidence, but, in fact, strongly condemns such tactics. In this proceeding, however, we are solely interested in determining whether the evidence, no matter how secured, indicates that Herrscher has committed acts warranting discipline.

■ Although such evidence is admissible, it is also true that in weighing the evidence produced against Herrscher, we must take into consideration the background of these charges. We have no doubt that from the beginning of this proceeding the Perrys have been mere tools in the hands of Kerrigan, who has used this proceeding as a means of furthering his own selfish and personal designs and to further the designs of his clients. Although Kerrigan was not called as a witness by The State Bar, he was called as a witness by Herrscher and, as such witness and on the advice of counsel, he refused to answer most questions asked him, on the ground that his answer would tend to incriminate him. A reading of the record convinces us that this proceeding was instigated for the purpose of furthering a private grudge and out of personal spite. In weighing the evidence, it is, therefore, necessary to keep in mind the ruling of this court in *Peck* v. *State Bar*, 217 Cal. 47, 51 [17 Pac. (2d) 112], where it was said:

"It is, of course, true that the merits of the charges made do not depend upon the motives of the instigator of the charges, but on the other hand, it is also true that The State Bar is not to be used as an instrument for the furtherance of private grudges, and that evidence which bears the earmarks of private spite should be scrutinized most carefully and accepted with extreme caution."

See, also, *Kilpatrick* v. *State Bar*, 220 Cal. 689 [32 Pac. (2d) 348].

We turn now to a review of the evidence as to the merits of the three charges.

■ Turning first to the charge that the $23,000 (or $28,000) fee was so exorbitant as to shock the conscience, it is the theory of The State Bar that, not only was this fee excessive, but that it was exacted from Perry at a time when Herrscher knew that Perry was incompetent. It is rather difficult to follow the reasoning of the Board of Governors on this charge. They find the total fee to be $28,000 and then find that this fee must be divided into two parts—$20,000 for recovering the automobile and $8,000 for the other services rendered. The $8,000 fee is found to be justified. But, the Board also finds that as one of the elements of the offense charged, Herrscher knew when he collected the $20,000 (on April 11, 1929, some two weeks after he first met Perry) that

Perry was "mentally and physically ill". If Herrscher knew that Perry was mentally incompetent on April 11, 1929, he also knew it when he exacted the $8,000 fee and, of course, exacting even a reasonable fee from a man known to be insane would also be reprehensible. Moreover, nearly every act set forth in the briefs of The State Bar in an effort to sustain the finding that Herrscher knew that his client was insane when he collected the $20,000 occurred long after April 11, 1929.

We are of the opinion that the Board's findings in reference to this charge cannot be sustained. We are of the opinion that the weight of the evidence clearly indicates that the total fees received during this seven-month period cannot be segregated into fees for separate items, but must be considered as one fee for all services rendered during this period. We are further of the opinion that the weight of the evidence sustains the finding of the local administrative committee that the total amount received by Herrscher during this period was $23,000 and that the finding of the Board that this sum was $28,000 should not be sustained.

The first payment by Perry to Herrscher was $15,000, paid in cash on April 11, 1929. Of this sum, Herrscher paid Shortridge $4,000, as already stated. On April 23, 1929, Herrscher mailed Perry a statement requesting $5,000 as an "additional retainer". This sum was paid on May 8, 1929. The balance of $3,000 was paid on October 26, 1929, the check being labeled "in full for legal services to date."

An examination of the record indicates to us that the services rendered by Herrscher during this period were of such a character as to warrant the fee charged, and we are further of the opinion that the weight of the evidence indicates that Perry, although erratic and extravagant, was not mentally incompetent at this time.

In considering the nature, extent and character of the services rendered by Herrscher to Perry during this period, some reference must be made to Perry's personal characteristics. The Board of Governors found that Perry was "boastful, arrogant, selfish, conceited, opinionated, domineering, tyrannical, overbearing, dogmatic, obstinate, profane, abusive, irascible, fault-finding, emotional, and of ungovernable temper". This finding is amply supported by the record.

Immediately after securing the release of the automobile in April of 1929, Herrscher undertook to represent Perry in many different matters. In all of them Perry insisted that Herrscher give his personal attention to all of Perry's affairs and refused to permit anything to be done by subordinates. Perry made Herrscher's office his headquarters and had an office there reserved for his personal use, and made full use of the office facilities. Perry was not an ignorant client by any means. He was a retired business executive, accustomed to handling business affairs of great magnitude, a heavy investor in the market, and possessing a fortune of over a million dollars.

One of the important matters handled by Herrscher during this period had to do with Perry's yacht. This yacht had been purchased by Perry for $102,250. In 1929, Perry expended about $150,000 for the upkeep and repair of this boat. Nearly all of this sum was expended under the personal supervision of Herrscher. When Herrscher was first retained, the yacht was in the east. Perry ordered the crew to bring the yacht to California. The crew put in at Miami, Florida, and refused to proceed further unless Perry would pay them an additional $8,000. Herrscher, with the consent of Perry, sent Macgrueder to Florida, and personally instructed and directed Macgrueder in the handling of this difficulty. Macgrueder, under Herrscher's supervision, straightened out this difficulty, and the yacht proceeded towards the west coast. It failed to arrive at San Diego on schedule, whereupon Herrscher, accompanied by Perry, went to San Diego to investigate. Herrscher spent about a week trying to locate the yacht and finally, through the cooperation of the Coast Guard, which Herrscher secured, the boat was located lying idle in the ocean, the crew killing time, hoping to collect another month's salary. Herrscher handled the examination of the crew before the proper board, settled the dispute, hired a new crew, and sent the boat to San Pedro for repairs. Herrscher examined various witnesses before the United States Commissioner and ably and competently settled many claims against the yacht. Through Herrscher's efforts, Perry collected $1359 from the seller of the yacht, Perry claiming that this sum was due him. Herrscher also secured Perry's admission to the St. Francis Yacht Club, procured a

cheaper mooring place for the yacht, and performed many other services too numerous to mention.

Another very important matter handled by Herrscher during this period concerned Perry's mistress. When Perry came to California in 1929, she, apparently at Perry's request, followed him to this state. Herrscher handled all transactions with her, secured her an apartment, supervised its furnishing, paid her sums of money, saw that she was entertained socially, etc. This employment required considerable tact and was admittedly ably and competently handled by Herrscher. Although in several letters addressed to Herrscher and to Perry she indirectly on several occasions threatened Perry, Herrscher handled the situation so tactfully that no legal action resulted.

During this period, Herrscher personally handled (on behalf of Perry) many disputes between Perry and his architects and various contractors, arising out of the construction of the $300,000 home Perry was constructing at Pebble Beach. Herrscher also handled innumerable difficulties between Perry and his servants, hired new ones, and took care of the complaints of those discharged. Herrscher also drew a will for Perry and drew a complicated trust agreement for him, which, however, was never executed.

The above constitutes but a brief reference to some of the services performed by Herrscher during this period.

The State Bar, in support of its recommendation for disbarment of Herrscher for the fees charged in this period, contends that the evidence shows Herrscher knew or should have known that Perry was mentally incompetent at this time. Some reliance is placed on alleged conversations Herrscher is supposed to have had with one McCarthy, one of Kerrigan's operators, in which Herrscher is supposed to have said that Perry was "crazy". McCarthy was a completely discredited witness, all charges based upon his testimony being dismissed by the Board. Considerable reliance is placed upon certain letters written by Herrscher to friends of Perry in New York, asking them to use their influence on Perry to induce him to execute a spendthrift trust. In these letters Herrscher emphasized Perry's erratic and extravagant conduct and referred to Perry as acting like a crazy man. We find nothing in the letters but the sincere solicitude of an attorney trying to protect a wealthy, self-willed client against

his extravagances. It is quite significant that Dr. Inman, a specialist in nervous diseases, who cared for Perry in November, 1929, after. two weeks of observation in the hospital, discharged Perry as sane and testified that Perry was sane during 1929. Perry was, in fact, suffering from a syphilitic condition, which, coupled with the loss of a considerable portion of his fortune and an automobile crash in June of 1930, resulted in his insanity, but Dr. Twitchell, who cared for him in a sanatorium during 1930, testified that it would have been almost impossible for even a doctor to have known of Perry's condition.

Considering the character of the client, the services admittedly performed, the wealth of the client and the other factors mentioned above, we find nothing justifying censure or discipline for the fees charged by Herrscher in this period.

The second charge found sustained by the Board of Governors, and upon which it based its recommendation of disbarment, has to do with the $50,000 contract entered into in October of 1930 between Herrscher and Ehrlich on one side and Mrs. Perry on the other. It is worthy of mention that Ehrlich was a partner of Herrscher in this transaction, was named as one of the contracting parties, was present at and participated in the interview at which Mrs. Perry is supposed to have been practically forced into signing the contract, and received half the moneys paid under it. No charges were filed, however, against Ehrlich. If the securing of this contract, under the circumstances disclosed by the record, constituted an offense warranting discipline, it would seem clear to us that the rule announced by this court in *Gray* v. *State Bar,* 1 Cal. (2d) 226 [33 Pac. (2d) 1016], would be applicable. In that case, it was held that all parties involved in the transaction under question should be proceeded against.

Although we are of the opinion that the fee charged for the services performed and contemplated to be performed under this contract was very large, and probably excessive, we do not believe that the circumstances of the case are such as to bring it within the rules announced, *supra,* so as to warrant the discipline of the attorney or attorneys involved. Nor do we think that, weighing the evidence by the rules already announced, the inference contained in the argument in The State Bar's brief to the effect that the evidence shows

that Herrscher took advantage of the ignorance of Mrs. Perry and practically forced her to sign the contract is justifiable.

The contract contemplated that the sum therein mentioned was to be payment in full for services rendered Perry prior to July 2, 1930 (the date upon which he was declared incompetent); for services rendered Mrs. Perry personally; and for the services rendered Mrs. Perry as guardian of the estate· of her husband. When the contract was signed in October of 1930, Perry was out of the sanatorium and out of danger of immediate death. The contract contemplated services by Herrscher in the handling of the estate until Perry's death, or until his restoration to competency—an uncertain period.

The services rendered and to be rendered, for which the $50,000 was to be paid, are too numerous to set forth in full herein.

As already set forth, when Perry was on his way to Honolulu, the 1929 stock market crash occurred. Perry was considerably distressed. He and his wife left the yacht in Honolulu and immediately returned to San Francisco. At Mrs. Perry's request, Herrscher met them at the boat and, because of Perry's then condition, immediately had him placed under the care of a physician, a specialist in nervous disorders. Herrscher made all arrangements. Perry remained in the hospital for two weeks and was then discharged as completely recovered.

About this time, Perry's mistress was practically demanding that Perry choose between his wife and her. She had threatened to make a scene at the boat upon Perry's return from Honolulu but, upon Herrscher's promise to arrange an interview, agreed not to do so. Herrscher arranged a meeting between the three principals and so handled this delicate situation that Perry's mistress returned to the east, apparently satisfied and without further demand.

Herrscher sent an attorney from his office to Honolulu in connection with the yacht. When the troubles there were satisfactorily settled, he had the yacht returned to San Francisco. He then rented the boat for a short period at an attractive rental and ultimately handled the sale of the boat. For the estate of the incompetent, he settled numerous claims, some large, some small, at about fifty cents on the dollar. These services required considerable time and considerable correspondence.

The United States government was making a large claim (about $80,000) against the estate, on account of 1929 income tax, and claimed a lien on Perry's property. Herrscher got the yacht and the Pebble Beach property released from the lien. He tried to compromise the government's claim for a fraction of the amount claimed by it and informed Mrs. Perry that he believed it could be settled for about $5,000. By letter addressed to Mrs. Perry, it was agreed as part of the contract of October 14, 1930, that Herrscher and Ehrlich would pay Kanouse, an income tax expert, the sum of $2,640.12, out of their fees. It was also contemplated that Herrscher should take a trip to Washington, if necessary, at his own expense, in connection with the tax claim.

He spent considerable time and effort in attempting to exchange the Pebble Beach properties, which had cost Perry over $300,000, for income-bearing properties in San Francisco. He also drew a will for Mrs. Perry. The Board expressly finds that in performing these and numerous other matters on behalf of Mrs. Perry, as guardian, that "there is no question but that a great deal of respondent's time and attention was required and given. The services so rendered were performed in a capable manner."

As already stated, it is the theory of The State Bar that the evidence indicates, not only that the fee was largely excessive, but also that Herrscher took advantage of Mrs. Perry's supposed lack of business experience, and practically forced her to sign the contract. The uncontradicted documentary evidence refutes this theory. Herrscher first wrote to Mrs. Perry concerning the fee on October 6, 1930, stating that he believed the fee should be determined before she left for New York and briefly referring to the services rendered and to be rendered. The letter indicates that prior conversations had been had on this subject. Mrs. Perry called upon Herrscher and, on October 7th, he wrote her a letter, setting forth substantially the terms of the contract as later signed by the parties. On the same date, Herrscher gave Mrs. Perry a letter enumerating the services that had been rendered. A conference was had between Herrscher and Mrs. Perry on October 8th, and another on October 9th. Mrs. Perry then suggested that the fee be reduced to $40,000. To this suggestion, Herrscher and Ehrlich refused to accede. Mrs. Perry then suggested that certain matters

mentioned in the contract be deleted and certain other provisions changed. She suggested that the interest rate be lowered from 6 per cent to 4 per cent; that the maturity of the note be extended; that interest should not start to run until January, 1931. Herrscher consented to all of these changes. It is quite apparent from Mrs. Perry's testimony, and from the documentary evidence, that Mrs. Perry knew what she was doing and had a pretty good idea of business affairs. Mrs. Perry apparently had the completed contract in her possession from October 9th until it was signed on October 14th. No attempt was made to rush Mrs. Perry into signing the contract. She could, if desired, have secured independent advice. She testified that she went to Herrscher's office on October 14th, after having told him that she would call that day and sign the contract, with the intent of telling him that she desired more time to consider the contract, but she also testified that she did not communicate this desire to Herrscher. The finding of the Board of Governors to the contrary is totally unsupported. She did testify that she signed because Mr. Perry walked into the room and that this so disturbed her that she would have signed anything rather than excite him. As we read the record, there is no evidence to indicate, directly or indirectly, that any pressure was brought to bear upon her in signing the contract. It is true that Herrscher had her pay him $18,000 from the estate without first securing an order of court, but the contract expressly provided that it would be submitted to the court and, in fact, when Herrscher prepared the proposed guardian's report, he attached thereto the contract, as an exhibit. He was, of course, able at all times to repay this sum, if the court should disapprove the contract. These facts have been held to be of some weight in determining culpability. (*Peck* v. *State Bar*, 217 Cal. 47 [17 Pac. (2d) 112].)

After the contract was signed, Mr. and Mrs. Perry went to New York. In December, 1930, Herrscher submitted to Mrs. Perry a proposed guardian's report, setting forth in detail the services rendered and, as stated above, attaching thereto a copy of the contract. Mrs. Perry refused to sign, because the report was too voluminous and on the ground that the report displayed too much ego on Herrscher's part. It is significant that several months after returning to New York and after Mrs. Perry had had the opportunity to consult with

friends and advisers in New York, she did not object at all to the terms of the contract. There was considerable correspondence between Herrscher and Mrs. Perry after she returned to New York, and it is also significant that this correspondence indicates a very friendly feeling on Mrs. Perry's part toward Herrscher. There is no indication that she felt that she had been defrauded or forced into the contract.

The State Bar contends that the evidence also shows that Perry's estate was insolvent when the agreement was entered into. Much is made of a letter written by Herrscher to the internal revenue department in connection with the attempted compromise of the tax claim, in which Herrscher sets forth the assets of the incompetent at $102,000 and his liabilities (including the $32,000 note held by him and Ehrlich) at $150,000. A reading of the letter indicates that it was a bargainer's statement as to assets, written in the hope of forcing the government to accept a compromise. The largest part of the listed liabilities consisted of the $80,000 claim of the government and the $32,000 note. The letter lists the Pebble Beach properties, costing over $300,000, as valueless, although the mortgage thereon was for but $125,000. The record also shows other assets not listed.

We repeat that, although the contract provided for a large fee, and probably an exorbitant one, and although, in a civil action, it probably could not be sustained, we do not believe that this alone warrants discipline. The other elements required to warrant conviction in this *quasi*-criminal proceeding are not present.

The last charge made against Herrscher has to do with the so-called furniture transaction. The Board of Governors found that Herrscher made a secret profit of about $4,000 at Perry's expense on this deal. This is the most serious charge preferred against Herrscher.

Herrscher was president of the Kaeleku Sugar Company, which corporation operated a large sugar plantation in the Hawaiian Islands. This company purchased all supplies through Herrscher, who was designated as factor for the company. As such factor, Herrscher was privileged to purchase furniture on the San Francisco Furniture Exchange at wholesale rates. Miss E. R. Johnson was employed by Herrscher as secretary and she was also secretary of the sugar company. She apparently was a highly trusted employee,

having authority to sign and cash checks, and being in complete charge of the records and books of the office, and of Herrscher's personal books. The evidence shows that Herrscher seldom examined the books. Among her other duties, she did most of the purchasing of supplies, in Herrscher's name, for the sugar company. These purchases were very large, totaling in some years as much as $150,000.

Some time in April of 1929, Perry desired to purchase furniture for his home at Pebble Beach, for his San Francisco apartment, and for his yacht. He discussed the matter with Herrscher. The latter informed Perry that Miss Johnson could probably secure the furniture for him, but that she would have to handle the transaction. The record is clear and Perry's own testimony shows that Miss Johnson alone handled the transaction. There is a dispute as to whether Miss Johnson told Perry that she would get him furniture at wholesale, or at a 25 per cent discount. The correspondence between them indicates that she promised him a 25 per cent discount. Perry testified that she promised him the furniture wholesale. Miss Johnson purchased for Perry, devoting considerable time to the transaction, furniture of the retail value of $9,226.84. This furniture actually cost about $5,000. Miss Johnson paid for the furniture by checks drawn and signed by her on the sugar company account. She billed Perry for the furniture for $9,226.84, less 25 per cent. Perry neglected to pay the bill. Miss Johnson then informed Perry by letter that unless he paid the bill by a definite date the 25 per cent discount would be lost. She did not tell him that she had, in fact, already paid the bill. Perry failed to pay the bill by the date mentioned, whereupon Miss Johnson billed him for the full retail price. Perry ultimately sent to Miss Johnson a check drawn to the order of Herrscher for the full retail price and enclosed with the check a letter to Miss Johnson, in which he stated that "I don't believe Mr. Herrscher ever authorized the squandering of $2500 (referring to the 25 per cent discount) just because conditions were such I could not promptly meet the bill". This and other evidence clearly indicates that at least up to this point Miss Johnson alone handled this transaction and that Perry knew that Herrscher knew nothing about the details.

When the check for $9,226.84 arrived at the office, Miss Johnson asked Herrscher to endorse it. He asked her what it was for and she told him that it was in full for furniture purchased for Perry. Herrscher suggested that she type that information above the endorsement and that was done. Miss Johnson and Herrscher testified that she did not tell Herrscher of the details of the transaction, and this testimony is corroborated by her subsequent actions. Miss Johnson then took the check to the bank and cashed it. She then deposited $5,000 of the cash in the sugar company account, to refund to that account the sum used by her to buy the furniture. She then took about $1500 and deposited it in one of Herrscher's accounts and kept the balance of about $2,500 in cash in the safe in an envelope, with her name on it. Apparently it was her view then that she had earned this $2,500 (about the amount of the 25 per cent discount) and that she was going to keep it. She testified that she subsequently withdrew from Herrscher's account the $1500 deposited therein and used the same for her own purposes. She further testified that she covered up these transactions by the entry of fictitious items. She identified the checks by which this $1500 was supposed to have been withdrawn.

It is perfectly clear that someone made a secret profit on this deal. The question is, did Herrscher know about it and did he knowingly participate therein?

Herrscher testified that he was entirely ignorant of this secret profit until March or April of 1931, when, during the negotiations with Finn, the matter came to light. Both Webb and Attorney Hayes, office associate of Herrscher, testified as to the latter's complete amazement and anger when he discovered the true facts. There is not one bit of evidence that indicates that Herrscher knew of this deal until this time. All the direct evidence is the other way. The finding of the Board of Governors to the effect that Herrscher knew of and participated in this secret profit is based on inference alone. We do not feel justified in disbarring an attorney on such inferences, when the direct evidence and the surrounding circumstances bear out his version of the transaction.

At the hearing, Miss Johnson made a most unconvincing witness. If the correctness of her story were based on her testimony alone, we should be inclined to hold with the Board that her story is not entitled to belief. She attempted to as-

sume full responsibility for the defrauding of Perry. She at first refused to disclose what she had done with the money and told many different inconsistent stories, until finally, at the determined insistence of Herrscher's attorneys, she disclosed that several months after she had cashed the $9,000 check, she used over $2,500 of the money to repay certain embezzlements of a relative. The relative was produced and he told his story to the examiner, and the examiner expressed himself as satisfied. The company for which the embezzling relative worked and from whom he had stolen the money corroborated the story.

The witness, Miss Johnson, also made an unfavorable impression in that, on her cross-examination, it developed that while Herrscher was in Europe and while the Grand Jury had Perry's charges under consideration, she paid out $10,000 of Herrscher's money for the purpose of bribing the Grand Jury. The money was not so used, the instigator of the plan pocketing the major portion of the money. The examiner for The State Bar frankly admitted and, in fact, stipulated that Herrscher knew nothing of this deal and had nothing to do with it. When Herrscher returned, he retained counsel and forced the instigator of this plan to disgorge a portion of this money so received.

After a careful reading of the record herein, we are of the opinion that the findings of the Board of Governors are not supported by the weight of the evidence It therefore follows that the proceedings against petitioner should be dismissed.

It is so ordered.

Preston, J., did not participate herein.

Rehearing denied. Shenk, J., voted for a modification of the opinion.