[L. A. No. 13707.  In Bank.—December 22, 1932.]

EARL CURTIS PECK, Petitioner, v. THE STATE BAR
OF CALIFORNIA, Respondent.

William Fleet Palmer for Petitioner.

Philbrick McCoy for Respondent.

THE COURT.—This proceeding was instituted by petitioner for the purpose of reviewing an order of the Board of Governors of The State Bar of California recommending that he be disbarred from practice of law in this state. No findings were made by the Board of Bar Governors but by resolution of said board the findings of the local

administrative committee were adopted and the recommendation of disbarment based thereon made to this court. Two separate matters were presented to the Board of Bar Governors. The first was based upon the complaint of Charles E. Paterson, a real estate dealer, that the accused had misappropriated to his own use $4,550, deposited as 10 per cent of the purchase price of a certain piece of real property situated in the city of Los Angeles. This is the most serious charge and it was upon this charge that the recommendation of disbarment was based. The second matter consisted of four informal complaints. Upon two of these charges the accused was acquitted and completely exonerated. The other two charges involve comparatively small amounts of money, and their chief importance depends upon whether or not they indicate a course of conduct on the part of the accused of misappropriating money belonging to others.

We will first consider the question of the alleged misappropriation of the $4,550. The accused, while pointing out that the findings of the local administrative committee are erroneous as to some very vital facts, concedes that certain facts upon which the recommendation was based are true, and while admitting that he is guilty of mingling a client's money with his own, declares that it was done through an error of judgment and denies that it was done with a guilty intent of appropriating the money to his own use. These facts, briefly stated, are as follows: Some time in January, 1930, Charles E. Paterson, the complaining witness, at the suggestion of Francis D. Adams, an attorney, telephoned the accused with respect to the purchase of the southeast corner of Thirty-fifth Place and University Avenue in Los Angeles. This property was listed in the estate of John Rey, deceased, and the accused with Mr. H. A. Decker and said Francis D. Adams were attorneys of record in that estate. They were also attorneys in the estate of John Rey, incompetent, and the estate of Mary Rey, incompetent, said Mary Rey being the wife of John Rey. After several conversations over the phone with reference to the purchase of the property, the price of $45,500 was arrived at as the purchase price. In the meantime, Mary Rey had died and the accused, who represented Florence Brooks, the administratrix in one of said estates

and the guardian in the two other estates above referred to, represented her as contestant of the will of Mary Rey, deceased. The property here involved was also listed in the inventory of the estate of Mary Rey, deceased, and on April 11, 1930, when Paterson turned over to the accused a certified check in the sum of $4,550 as a 10 per cent down payment on the purchase price, the accused gave to him a typewritten receipt in which he acknowledged receipt of the check as 10 per cent deposit of the amount offered for the certain lots, describing them, and stating ownership of the property to be in the estate of Mary Rey, deceased. The receipt stated that he would attempt to secure confirmation of sale at the price of $45,500 and that in the event of his inability to secure acceptance of the offer by the administrator within thirty days from date, the money derived from the check should be returned to Mr. Paterson, or order, on demand. This check was deposited by the accused in the account of Janet Barth, trustee, in the National Bank of Commerce of Los Angeles. It appears that Janet Barth was the stenographer and secretary of the accused and she drew checks upon this account at his suggestion. Admittedly no declaration of trust was ever made or signed by her with reference to this account. It is apparent from the statement of this account furnished to the administrative committee by the accused that checks were drawn against this deposit for his personal account immediately after its deposit. On June 4, 1930, there remained in the account the sum of $2,187.14, and on that date said sum was attached by Hermine M. Keegan, a creditor of the accused, leaving the account entirely depleted. Thereafter deposits and withdrawals were made almost daily. On July 31, 1930, the escrow, opened with reference to the purchase of the property, not having been closed, Paterson demanded a return of his deposit from the accused, which accused was unable to make by reason of the fact that there was in the bank, as shown by the bank statements, only a balance of $92.79. If these were the only facts of the case, it is obvious that the accused was guilty of a misappropriation of funds and that such conduct unquestionably merited disbarment.

Accused, however, offers an explanation of his conduct, which, if true, offers some justification for his actions. This

explanation is reasonable and is supported by such strong evidence that we think there can be no question of its truth. It appears that in the three Rey estates in which accused was interested as attorney with H. A. Decker and Francis D. Adams, attorneys' fees in the total aggregate of $27,750 had been allowed and had been made a lien upon the property in the three estates. The orders granting said fees were all made prior to April 11, 1930, the date on which the accused accepted the check of $4,550 from Paterson and deposited it in the Janet Barth trustee account. It was accused's explanation that inasmuch as he had a lien upon this property by reason of his attorney's fees he did not deem it necessary for him to keep this deposit in a separate account as he could, upon the confirmation of sale, give a receipt for that amount of money as payment for his attorney's fees. It also appears from the testimony of Hermine M. Keegan, who attached the bank account in the sum of $2,187,14, that after the attachment was made by her she asked him for security for the payment of other money which he owed to her by reason of loans which she had made to him and he made over to her as security an assignment of the attorney's fees due to him, but with the understanding that if it were necessary for him to repay Paterson that she would loan to him the necessary $4,550. On July 31, 1930, when Paterson demanded a return of the money, the accused invited Paterson to accompany him to Mrs. Keegan, and a satisfactory arrangement was made whereby Mrs. Keegan released from her assignment the sum of $4,550 to cover this deposit, and the assignment was put in escrow to protect Paterson's deposit. Thereafter on September 3, 1930, Paterson demanded the actual repayment of the deposit, and the accused repaid him the entire deposit of $4,550 by cashier checks, this amount having been loaned to him by Mrs. Keegan. Afterwards the sale of the property was completed upon the terms agreed upon by the accused and Paterson.

On November 25, 1930, complaint was made to the president of the board of governors of The State Bar by Paterson in a five-page letter which admittedly was not written by Paterson but by Francis D. Adams, with whom the accused had had considerable trouble over the attorney's fees allowed in the three estates. According to the testimony

of Adams, the accused was working for him on a straight salary basis with the understanding that he, Adams, was entitled to all fees collected whether the business had been brought into the office by the accused or not. He testified that the accused had done "about 90% of the work" in these matters and that he had promised him a 25 per cent percentage of the attorneys' fees allowed. We do not have the accused's side of this controversy, but it is quite evident that a great deal of ill feeling was engendered by said dispute, and the testimony of Adams at the hearing of the charge against accused is replete with insinuations and innuendoes entirely irrelevant to the charge preferred. It is, of course, true that the merits of the charges made do not depend upon the motives of the instigator of the charges, but on the other hand, it is also true that The State Bar is not to be used as an instrument for the furtherance of private grudges, and that evidence which bears the earmarks of private spite should be scrutinized most carefully and accepted with extreme caution.

There can be no question but that the accused is guilty of a violation of rule 9 of Rules of Professional Conduct formulated by the board of bar governors and adopted by the Supreme Court as the rules of this court. This rule provides that: "A member of The State Bar shall not commingle the money or other property of a client with his own. . . . " This salutary rule was adopted to provide against the probability in some cases, the possibility in many cases, and the danger in all cases that such commingling will result in the loss of clients' money. Moral turpitude is not necessarily involved in the commingling of a client's money with an attorney's own money if the client's money is not endangered by such procedure and is always available to him. However, inherently there is danger in such practice for frequently unforeseen circumstances arise jeopardizing the safety of the client's funds, and as far as the client is concerned the result is the same whether his money is deliberately misappropriated by an attorney or is unintentionally lost by circumstances beyond the control of the attorney. It appears from the record that the accused at all times since the acceptance of the money had funds due him secured by a lien on the property of the three estates with which to reimburse the

complaining witness, and also that when a demand was made upon the accused for an actual repayment of the money he immediately complied with the request. While we are of the opinion that the conduct of the accused in so commingling the funds entrusted to him with his own is to be most severely condemned and merits disciplinary action, we are not satisfied, as found by the local administrative committee, that the accused did "wilfully, unlawfully and fraudulently take and appropriate" the money deposited with him by the complaining witness. In other words, we are not of the opinion that the accused intended to misappropriate and retain said money, but are of the opinion that he intended to offset it against his attorney's fees if the deal went through. And we are of the opinion that while such conduct was extremely censurable, it does not merit disbarment.

As before indicated, however, the recommendation of disbarment was not predicated upon the above charge alone. Accused was also charged with having appropriated to his own use the sum of $21 paid to him by his client, the plaintiff in a suit entitled *Kraemer* v. *La Salle*, for the purpose of paying the judgment for costs secured by the defendant in that suit. The judgment was entered on December 26, 1930, and in April or May, 1931, Kraemer turned over to the accused the sum of $21 with which to pay the judgment for costs. The accused, however, did not pay over the money to the defendant, La Salle, until November 12, 1931, the day of the hearing of the charge before the local administrative committee. His explanation was that at the same time he represented Kraemer in the suit against La Salle, he also represented one Peterson, plaintiff, in another suit against La Salle, in which he recovered for the plaintiff a judgment against La Salle in the sum of $3,000. Hearing that La Salle intended to take an appeal from the judgment in the Peterson case, and that La Salle was short of funds, he withheld payment of the $21 in order to embarrass La Salle as much as possible. The explanation is supported only by the word of the accused, but the money has in fact been paid over, and we are inclined to accept his explanation as true. Accused admits that such procedure was "very small business", and we thoroughly agree with him.

Accused was also charged with the unlawful appropriation of money belonging to the Balboa Marine Hardware Company in the sum of $89. The gist of the charge is that accused, as attorney for Rodgers Bros., the assignee of some ten or more creditors of Don Saunders, came into the possession of certain money obtained through the sale of a boat belonging to Saunders and in disbursing it failed to pay over to the Balboa Marine Hardware Company the total amount of $178 due said company and only paid over to said hardware company the sum of $89. Mr. Storey, the complaining witness, and owner of the Balboa Marine Hardware Company, did not know the exact amount of the total claims assigned to Rodgers Bros. nor did he know the amount of money which came into the possession of the accused, stating that the debts amounted to approximately $2,000, and that the boat sold for about $2,000, which was enough to pay all the claims and in addition to take care of the attorney's fee of the accused. According to his understanding, the buyer of the boat was to pay 85 per cent of the purchase price upon the delivery of the boat and 15 per cent in subsequent installments; the claimants were to receive 85 per cent of their claims immediately and the 15 per cent balance as the subsequent installments were made. Mr. Storey testified that on August 31, 1929, his firm had received through Rodgers Bros. a check of the accused in the sum of $178, which represented 85 per cent of their claim of $209.42, but when it was presented for payment it was mailed back with the notation across the check, "payment stopped". He, thereupon, got in touch with Rodgers Bros., who took the matter up with the accused, and in about twenty days he received another check for $89, which was one-half of the original check. The charge against the accused was based upon the fact that no further payment was received by the hardware company either in the sum of $89 or any lesser amount. The accused admitted stopping of payment on the check and that he had not thereafter sent to the complaining witness a check for the further sum of $89. He testified that he felt he was justified in stopping payment on the check by reason of the fact that within a day or two after mailing the checks the purchaser of the boat had filed his petition in bankruptcy and he was afraid that he would be called upon

to pay over the money previously received by him to the receiver in bankruptcy. He also stated that he had discovered an error in his calculations and that in addition to this, Lilliam Palmer, who was also to share in the division of the proceeds of the boat, insisted on receiving a larger share than had been allocated to her. He stated that at a subsequent meeting with Mr. Rodgers of Rodgers Bros. it was agreed that he should turn over all the money in his possession and the collection of any further funds to one G. C. Waterhouse, who would make distribution to all parties who were entitled thereto with the exception of Lillian Palmer and that he had thereafter turned over to Waterhouse the balance of the $1200 received as 85 per cent of the purchase price of the boat. In substantiation of this latter fact, the accused presented canceled checks, together with receipts from G. C. Waterhouse (with the exception of a receipt for $50 which he was unable to locate), which, considered in conjunction with his claim for attorney's fees of $50, apparently evidenced the payment of the entire $1200 received by him in this transaction. He further stated that he had agreed to pay the $89 claimed to be due by Mr. Storey when pressed by him for it because his accounts were mixed up and he would rather pay the amount, although he had already paid over to Mr. Waterhouse everything he owed, than have Storey take the matter up with the Bar Association as he threatened to do. The accused failed to substantiate his explanation in several important particulars, and there can be no question but that the accused either deposited the $1200 in his regular bank account or in another bank account in which other trust funds were intermingled, rather than in a separate trust account. There is also no question but that the Balboa Marine Hardware Company was entitled to receive more than the $89 which it did receive on its claim against Saunders and that this loss to the hardware company was due in a measure to the fault of the accused. However, it also appears by checks and receipts offered by the accused in substantiation of his claim that he did not appropriate the $89 to his own use, that he did pay over to Waterhouse money totaling the entire amount received by him through the sale of the boat. The record shows no attempt to discredit the authenticity of these checks and receipts, and

undisputed they are convincing that the accused did in fact pay over all the money which had come into his possession through this transaction. That the Balboa Marine Hardware Company did not receive all the money due it from the transaction is evident. But in this whole matter the hardware company dealt with the accused through Rodgers, or the firm of Rodgers Bros., of which Rodgers was a member, and it was, according to the testimony of the accused which is not seriously disputed, by the consent and agreement of Rodgers that accused paid all money due from him to Waterhouse, who was to distribute the same to the parties entitled thereto, of which the hardware company was one. Whether Waterhouse ever paid the money due to the hardware company to that company, or if he did not, the reason of his failure to make such payment is not clear from the record before us. It would appear that in paying said money to Waterhouse the accused acted in good faith, and while for his own protection, he might better have reserved from the amount paid Waterhouse the money due the hardware company and paid it direct to that company, we do not regard his actions in paying it to Waterhouse under the circumstances just related particularly censurable.

It is to be regretted that the evidence on both sides with reference to this charge is as meager as it is. The charge against petitioner is predicated almost entirely upon the testimony of Mr. Storey, the owner of the Balboa Marine Hardware Company, and it is apparent from the record that he was entirely unfamiliar with any of the details of the transaction as he dealt with the accused through Mr. Rodgers of Rodgers Bros., the assignee of the creditors. Perhaps Mr. Rodgers was not available as a witness at the hearing, but his testimony would have aided greatly in clearing up the actual details of the transaction and thereby making certain either the guilt or the innocence of the accused. The testimony of Mr. Waterhouse likewise would have been most helpful.

We are not satisfied from the record before us that the accused merits the extreme punishment of disbarment. We are satisfied that his conduct was extremely censurable, and, therefore, order that he be suspended from the practice of law in this state for the period of one year from and after the date of the filing of this order.