[L. A. No. 18353.   In Bank.   Dec. 2, 1942.]

SUMNER C. BRYANT, Petitioner, v. THE STATE BAR
OF CALIFORNIA, Respondent.

Philbrick McCoy, Glen Huntsberger and L. M. Handley for Petitioner.

Jerold E. Weil and Chester F. Dolley for Respondent.

THE COURT.—By this proceeding petitioner seeks a review of the decision of the Board of Governors of The State Bar of California recommending his disbarment from the practice of law.

The recommendation of the Board of Bar Governors was made after a hearing held by a local administrative committee for the county of Los Angeles, which resulted in findings and conclusions of law adverse to petitioner, upon which the committee made its recommendation that petitioner be disbarred. The findings of the committee, with slight modifications, were adopted by the Board of Bar Governors.

The hearing before the local administrative committee was had upon an amended notice to show cause and petitioner's answer thereto. In the amended notice to show cause, petitioner was charged with the violation of his "oath and duties as an attorney and counsellor at law within the meaning of section 6103 of article 6 of the Business and Professions Code of the State of California, as the same are prescribed by sections 6067 and 6068 of article 4" of said code "and the commission of acts involving moral turpitude and dishonesty, within the meaning of section 6106 of article 6" of the same code.

The local administrative committee made extensive findings, which may be briefly summarized as follows:

The firm of Newton and Redondo was in the electrical display business and was the owner of three trucks equipped with electrical equipment for lighting display work. These trucks were subject to a conditional sales contract to secure the payment of a promissory note for $332.70, the property of the Universal Finance Company. Newton and Redondo desired to purchase from the Paramount Studios three Liberty motors and two electrical generators. After paying $200 on the purchase price of this property they needed $1,100 additional to complete the purchase. Paul Kalmanovitz agreed to loan them this sum. He made the loan in the following manner:

The Liberty motors and generators, instead of being transferred to Newton and Redondo, were transferred in the first instance to Lydia Koehnen (the wife and agent of Paul Kalmanovitz) by a bill of sale in her favor executed by the Paramount Studios for the sum of $1,100; then Lydia Koehnen transferred the motors and generators to Newton and Redondo by means of a like instrument. In payment thereof Newton and Redondo executed a promissory note for $2,300, and a chattel mortgage to secure the payment of said note covering their three trucks and equipment, the three motors and two generators purchased from the Paramount Studios, and other electrical equipment owned by Newton and Redondo. The note was further secured by a trust deed upon the home of Mr. and Mrs. Newton, in which petitioner was named as trustee. Petitioner stated that it would be necessary for Mr. and Mrs. Newton to execute the trust deed on their home as additional security for the payment of the $2,300 promissory note, as Kalmanovitz was making the loan prior to compliance with section 3440 of the Code of Civil Procedure (probably § 3440 of the Civil Code was intended), and that a reconveyance would be made within seven to ten days thereafter. After objecting to executing the trust deed, Mr. and Mrs. Newton finally signed the same. These papers were all drawn by petitioner. After these papers were executed, Paul Kalmanovitz loaned Newton and Redondo the sum of $1,100 only, by paying to the Paramount Studios the sale price of said Liberty motors and equipment. Petitioner was fully acquainted with the true nature of said transaction prior to the preparation of any of the documents, and prior to and at their execution.

The $2,300 promissory note was dated March 9, 1938, and

payable in installments of $100 per month at any place designated by Lydia Koehnen, the first payment falling due April 9, 1938, which was Saturday. No place of payment had been designated by Lydia Koehnen, and on Monday, April 11, 1938, Newton and Redondo inquired of Kalmanovitz where they should make the payment, and were informed by him that he had placed the matter in petitioner's hands. On the same day Newton and Redondo tendered Kalmanovitz the sum of $100, which the latter refused to accept. They then and on the same day consulted Lyle Rucker, Esq., an attorney. Mr. Rucker immediately telephoned petitioner and informed him that he (Rucker) had to be in Bakersfield the following day, April 12, and requested petitioner to take no further action until his return within a few days. Petitioner advised Rucker that nothing would be done until the latter's return. On April 12, in violation of his agreement, petitioner filed a verified complaint for claim and delivery as attorney for Lydia Koehnen and prayed for possession of the property and equipment covered by the chattel mortgage or for the sum of $2,300, if delivery could not be had; for $2,300 damages and $250 attorney's fees. The sheriff took possession of all of the personal property and equipment involved in the claim and delivery action. That action was tried and the transaction between Kalmanovitz and Newton and Redondo was declared usurious. Lydia Koehnen was given judgment for $1,100 without interest, and for a further sum of $315, which the plaintiff had been compelled to pay on a third party claim filed in said action by the Universal Finance Company, which was the amount then due on the note secured by the first chattel mortgage against the three trucks and equipment owned by Newton and Redondo. This judgment was entered on October 14, 1938. (When this matter came before the Board of Governors of The State Bar, that body modified a finding of the local administrative committee in respect to the reopening of said case, to take additional evidence so that the finding as modified should read as follows: "Thereafter the said Rucker [attorney for Newton and Redondo] moved the Court to reopen the said case for the purpose only of receiving additional evidence in regard to damage and deterioration of the said property involved, and on or about December 5, 1938, the Court granted said motion, and thereafter received evidence as to said additional damages, and on June 5, 1939,

made and entered an order allowing the defendants an additional sum for property not returned to defendants in accordance with the said judgment of October 14, 1938, and also made an order vacating the prior order reopening the case and vacating the said judgment and reinstating the said findings and judgment of October 14, 1938, therein. Said judgment became final.'')

The local administrative committee also found that petitioner as attorney for one Milton Long brought suit in April, 1939, against Redondo, Mrs. Newton and others (Mr. Newton having died in the meantime) on the identical promissory note and chattel mortgage which was the subject of the third party claim in the case of *Koehnen* v. *Redondo;* that after the commencement of the Long suit, the superior court in the case of *Koehnen* v. *Redondo* issued an injunction restraining Lydia Koehnen, her agents or attorneys, from negotiating or collecting any part of the funds represented by said note and mortgage and notwithstanding its service upon petitioner and his client, petitioner obtained a settlement of said Long suit by Redondo and Mrs. Newton, paying to his client the sum of $447.92, which sum was paid to Long who delivered it to Paul Kalmanovitz; that Lydia Koehnen was, during all of the times mentioned in said notice to show cause, the agent and ''dummy'' of Paul Kalmanovitz. The committee further found that petitioner failed and refused to reconvey to Mrs. Newton the real property conveyed to him as trustee by Mr. and Mrs. Newton on March 9, 1938, contrary to his promise to Mr. and Mrs. Newton to do so within seven to ten days thereafter, and contrary to the judgment entered in the case of *Koehnen* v. *Redondo* on October 14, 1938, although demand on him had been made for such reconveyance. It was only after an order of court holding Lydia Koehnen guilty of contempt and after the issuance of a bench warrant for said Lydia Koehnen on October 21, 1941, that petitioner as trustee reconveyed said property to Mrs. Newton.

The local administrative committee concluded from the finding of facts as summarized above that petitioner violated his oath and duties as an attorney at law within the meaning of section 6103 of the Business and Professions Code, as the same are prescribed by sections 6067 and 6068 of said code, and also that petitioner committed acts involving moral turpitude, dishonesty and corruption within the

meaning of section 6106 of said code, "in that he knowingly represented as attorney and prepared the documents for the instigator of a usurious transaction, contrary to the laws of the state; in that he participated as attorney, in an unjust, inequitable and outrageous attempt to secure valuable property by a course of conduct and proceeding which amounted to an attempted forfeiture based on an unjustified claim; in that he violated his agreement with another attorney and thereby attempted to and did take an unfair advantage of the clients represented by such attorney, in his absence; in that he knowingly was a party to a course of action designed to evade a judgment of a court of this state by means of subterfuge, he being one of the counsel appearing in said matter; and in that he violated a restraining order previously served on him made by a court of this state, by negotiating for and collecting in settlement a sum of money, including attorney's fees for his own benefit, contrary to the terms of said order."

As set forth in the Business and Professions Code, section 6103 reads: "A wilful disobedience or violation of an order of the court requiring him to do or forbear an act connected with or in the course of his profession, which he ought in good faith to do or forbear, and any violation of the oath taken by him, or of his duties as such attorney, constitute causes for disbarment or suspension." (Stats. 1939, p. 357.)

Section 6067 simply provides that a person on his admission to practice law shall take the required oath. (Stats. 1939, p. 354.)

Section 6068 reads: "It is the duty of an attorney: . . . (c) To counsel or maintain such actions, proceedings or defenses only as appear to him legal or just, except the defense of a person charged with a public offense." (Stats. 1939, p. 355.)

Section 6106 provides in part, as follows: "The commission of any act involving moral turpitude, dishonesty or corruption, whether the act is committed in the course of his relations as an attorney or otherwise, and whether the act is a felony or misdemeanor or not, constitutes a cause for disbarment or suspension." (Stats. 1939, p. 357.)

The position of petitioner is that the findings have no support in the evidence; and further, if they are so supported, that the facts found therein are not sufficient to justify disbarment or any disciplinary action.

We will first consider the contention that the findings are not supported by the evidence. It is conceded that the evidence on most of the issues herein is in sharp conflict; petitioner and his witnesses testify to one state of facts, while the witnesses of The State Bar give an entirely different account of the various transactions out of which this controversy has arisen. As we view the evidence before us, there are four transactions which form the most serious charges against petitioner. They are as follows:

(1) The drawings of the usurious documents;

(2) The violation by petitioner of his promise given to Mr. Rucker that no action would be taken against the latter's clients until Mr. Rucker's return from Bakersfield;

(3) The Long suit; and

(4) The failure of petitioner to execute a reconveyance of the real property covered by the deed of trust executed by Mr. and Mrs. Newton to secure the $2,300 promissory note. As this charge is not discussed nor referred to in any way by The State Bar in its brief, we assume that it has been abandoned.

■ (1) The drawing of the usurious documents. Newton and Redondo, through one Harry Phillips, were endeavoring to purchase from the Paramount Studios three Liberty motors and generators. They had secured a verbal option to purchase the property for $1,300 and had paid $200 down on the purchase price. They were to pay the balance within ten days and were having considerable trouble in securing the same. Harry Phillips contacted Paul Kalmanovitz respecting the loan. Shortly thereafter Kalmanovitz, Newton, Phillips, and a fourth person named Sherry, drove out to the Paramount Studios. According to Kalmanovitz's testimony, Newton had an option from the Paramount Studios for the three Liberty motors and electric plants (the generators are frequently referred to as plants). He (Newton) said he would like to purchase them very badly. Continuing, Kalmanovitz said, ''He said he would like to purchase, he wants them very bad, and he would give me any security I wished. So I said I would let him know and went back to my office and talked to Mr. Bryant (the petitioner).'' The next meeting as shown by the evidence was at petitioner's office. In the meantime, petitioner had prepared or assisted in preparing a bill of sale of the three Liberty motors and generators from the Paramount Studios to Lydia Koehnen.

He had also drafted a bill of sale of said motors from Lydia Koehnen to Newton and Redondo, and the $2,300 promissory note mentioned in the findings; and a chattel mortgage to secure said note covering the three Liberty motors and generators, the three trucks and their equipment owned by Newton and Redondo, and other equipment belonging to this firm. He had drafted a trust deed against the home of Mr. and Mrs. Newton with petitioner as trustee, as further security for the payment of the $2,300 note. These documents with the possible exception of the bill of sale from the Paramount Studios to Lydia Koehnen, were all prepared and ready for execution when the parties met at petitioner's office, as stated above. At this meeting, in addition to petitioner, there were present Kalmanovitz, Redondo, Mr. and Mrs. Newton, and Harry Phillips. It is not clear whether the bill of sale from the Paramount Studios had been executed at that time. This meeting was held on March 9, although the bill of sale bears the date of March 10, 1938. The bill of sale from Lydia Koehnen to Newton and Redondo of the three Liberty motors and generators had been executed by Lydia Koehnen. The other papers were executed as drawn, but not without considerable hesitancy on the part of parties executing them, and particularly by Mrs. Newton.

Petitioner contends, and so testified, that he drew these papers in accordance with the express direction of his client, Paul Kalmanovitz, and without any knowledge that they did not correctly express the real transaction involved. Paul Kalmanovitz corroborated this testimony of petitioner. However, we are not required to accept their evidence if the circumstances surrounding the transaction point to a contrary conclusion. The evidence is without conflict that it was Newton and Redondo who made the purchase from the Paramount Studios, and not Mrs. Koehnen. Mr. Kalmanovitz testified that Newton and Redondo had an option to purchase this property. He further stated that after he and the others mentioned had returned from the Paramount Studios, and Newton and Redondo had decided to complete their purchase if Kalmanovitz would loan them the money, Kalmanovitz went back to his office and talked with petitioner. It must have been that as a result of this conference with petitioner, the papers were prepared by petitioner as indicated above. Kalmanovitz was not a lawyer. It may be conceded that an ordinary layman would know that the giving of a promissory note for $2,300 in consideration of a loan of

$1,100 was contrary to the laws against usury in this state, but it hardly seems reasonable that he could have conceived the plan to have papers so drawn as they were prepared in this instance, so that at least upon their face they purported to evidence a perfectly legal transaction; whereas in fact the transaction was violative of the Usury Act. It is not contended that Kalmanovitz consulted any other attorney than petitioner. We think the committee was warranted in inferring from this evidence that petitioner drew the papers evidencing the transaction with full knowledge of their illegality and with the intent and purpose of evading the Usury Act of this state. In addition to these circumstances we have the direct and positive evidence of Mrs. Newton that on the occasion when the papers were executed in his office, petitioner said to Mr. Newton, "We are making it in the form of a bill of sale to get around the interest law, usury." If there were any doubts respecting petitioner's knowledge of the usurious character of the transaction, this evidence of Mrs. Newton would entirely remove that doubt. It is true that petitioner denies making any such statement as attributed to him by Mrs. Newton, but the circumstances surrounding this whole transaction, as stated before, point to the truth of Mrs. Newton's evidence.

(2) We will now pass to the charge that petitioner violated his agreement not to commence any action on the $2,300 note and chattel mortgage until Mr. Rucker, attorney for Newton and Redondo, returned from Bakersfield. Rucker's version of his conversation with petitioner was that on April 11, 1938, he called petitioner and stated that he represented Newton and Redondo but that he was compelled to be in Bakersfield on the 12th of April, and asked that nothing be done until his return, to which request petitioner agreed; that Rucker left for Bakersfield and was there on the 12th, but on his return found that petitioner had instituted the action against Newton and Redondo on the 12th. Petitioner's account of this matter was that he promised Rucker that he would not begin any action against Newton and Redondo without notifying Rucker's office; that his client insisted on beginning the action, and at the latter's insistence, petitioner, after telephoning Rucker's office and getting no response, instituted the action. While it is one attorney's word against that of another attorney, there are certain circumstances surrounding the affair which lend cre-

dence to Rucker's testimony. The pending action was of vital importance to the clients of Rucker, and he was fully aware of that fact at the time of his conversation with petitioner, which resulted in petitioner's promise. He undoubtedly wished to give the matter his personal attention, and for that reason exacted the promise of petitioner to defer any action until his return from Bakersfield. To have received a promise from petitioner simply to notify his office during his absence before beginning suit, would have been no protection whatever to his clients. It does not seem reasonable that any fairly careful attorney would have left his clients exposed to threatened litigation upon the mere promise that his office would in his absence be notified before the litigation was commenced. Evidently Rucker left no one in his office to represent him in his absence. Petitioner testified that he telephoned a number of times to Rucker's office on the day suit was brought before he filed the complaint therein but was unable to receive any answer to his call. These circumstances appear to us to be sufficient to discredit the testimony of petitioner and lend support to that of Rucker. This evidence we think justified the local administrative committee in finding that petitioner violated his word given to another attorney.

(3) The third charge against petitioner is the institution of the suit of Long against Newton and Redondo on the promissory note and chattel mortgage against the three trucks owned by the defendants in said action. This note and mortgage had been the subject of a third party claim in the action of *Koehnen* v. *Redondo,* and had been paid by the plaintiff in that action. In the judgment in said action rendered on October 14, 1938, the plaintiff was given judgment for $315, being the amount due on the promissory note at the time it was paid by Lydia Koehnen. As we have seen, petitioner was attorney in the Koehnen action. On April 17, 1939, petitioner as attorney for Milton Long, who claimed to have bought the note and mortgage from Kalmanovitz, brought a second suit on this note and mortgage against Mrs. Newton, and collected from her in that suit the sum of $447.92, being the principal and interest of the note, costs, and $40 attorney's fee. The only dispute as to the facts just related is the claim of petitioner that the evidence shows that the note was not paid by Lydia Koehnen but was bought by her. There is no contention that plain-

tiff in the Koehnen suit was not given judgment for the amount due on the note by the terms of the judgment. As we have seen, petitioner was the attorney for the plaintiff in the Koehnen action and in the Long suit. Petitioner contends that when he instituted the Long suit, the judgment theretofore rendered in the Koehnen action had been set aside, and therefore there was no adjudication of the promissory note and chattel mortgage which formed the basis of the Long suit. It may be conceded that this statement is true, but the note and mortgage were before the court in the Koehnen action, the rights of all parties interested therein had been determined by the court in favor of petitioner's client, and while this judgment had been vacated, its vacation thereof was for a purpose unconnected with either said note or mortgage. While it may not be said that petitioner instituted this second suit upon an obligation which he knew had been merged into a judgment in a prior action, it can be said that he brought two actions in which the same obligation was the subject matter in each litigation; that the second suit was brought when the first was still pending and in which the court had at least signified its intention to make findings favorable to his client. In the second action he not only put the defendants therein to additional costs and inconvenience, but he succeeded in securing for his client in the second suit full payment of the obligation upon which she had been given judgment in the first suit.

The findings as a whole in our opinion are amply supported by the evidence upon all three of the charges hereinbefore discussed, and it now remains for us to give consideration to the question as to whether the facts so found are sufficient to support the recommendation of The State Bar that petitioner be disbarred from the practice of law in this state, or that he be subjected to some lighter disciplinary action.

The local administrative committee concluded that petitioner had violated various sections of the Business and Professions Code, including section 6106 of said code. We think it will only be necessary to discuss petitioner's conduct, as set forth in the findings in relation to the provisions of this code section which reads as follows: "The commission of any act involving moral turpitude, dishonesty or corruption, whether the act is committed in the course of his relations as an attorney or otherwise, and whether the act is a

felony or a misdemeanor or not, constitutes a cause for disbarment or suspension." (Stats. 1939, p. 357.) By this section of the code conduct involving moral turpitude or dishonesty constitutes a cause for the disbarment or suspension of an attorney. Moral turpitude has frequently been defined as anything done contrary to justice or honesty. (*In re Hatch*, 10 Cal.2d 147, 150 [73 P.2d 885].)

"It is agreed that an attorney may be disbarred, not only for professional misconduct, but also for such misconduct outside of his profession as shows him to be so wanting in integrity and trustworthiness that the legal business of others cannot safely be intrusted to him. The right of the courts to exclude attorneys for loss of moral character, malpractice or offenses not punishable as a crime is established beyond all question, for the right to practice law is subject to the condition that the attorney shall possess a blameless moral character, and it is forfeited upon a breach of that condition. The public have a right to demand that no person shall be permitted to aid in the administration of justice whose character is tainted with dishonesty, corruption, crime or disloyalty or treasonable acts." (3 Cal.Jur. 727, § 122.)

Therefore, as we view the law in question, any flagrant act of dishonesty on the part of an attorney is made a cause for disciplinary action against him. The preparation by an attorney of documents whereby a usurious transaction is made to appear to be a legal transaction for the purpose of evading the laws of this state with knowledge of the real facts involved in the transaction, cannot be justified upon any theory of ethics. The failure of an attorney to keep his word pledged to a brother attorney, whereby the clients of the latter were put to heavy expense and loss, is equally dishonest and reprehensible. The institution of an action upon an obligation which was in litigation in a transaction wherein the client of petitioner had to all intents and purposes been accorded full relief, cannot be regarded in any other light than an attempt to obtain a double recovery upon a single cause of action, with an additional attorney's fee in his favor. No honest lawyer would be capable of using the process of the courts to accomplish such a nefarious purpose. With three such transactions, all attributed by legal and ample evidence to one individual, there can be no question as to their sufficiency to justify disciplinary action against the offending attorney. In the case of *In re Napthaly*, 7 Cal.

Unrep. 378, reading from the syllabus, it was held that "An attorney, with knowledge of the facts, who advises and takes steps to assist in a violation of the bankrupt law of the United States, whereby one creditor unlawfully receives a preference, is subject to suspension." We can see no appreciable distinction in legal effect between the acts of an attorney as stated in that case and the acts of petitioner, who advised his client and, by resorting to false and fraudulent means, assisted him to attempt the circumvention of the laws against usury, and thereby secure an unjust, illegal and excessive rate of interest upon the loan which his client was making.

While petitioner denies that he knowingly committed any of the wrongful acts of which he was found guilty by the local administrative committee, he also justifies his acts by asserting his lack of experience as a practicing attorney, the dominating character of his client, and the fact that the charges against him were instituted, and the principal evidence in their support was given, by Mrs. Newton and her attorney for the purpose of vilifying opposing counsel in a law suit. As to these matters of defense, the record shows that petitioner was admitted to the practice of law on May 9, 1933, and from that date until January 1, 1938, he was not in the general practice of law but was employed on a salary by the Texas Company in their right-of-way department, in which position he had no opportunity to participate in the actual conduct of litigation, although his employment by the Texas Company was a branch of its legal department. He opened an office for the private practice of law on January 1, 1938, and Kalmanovitz was one of his first clients, and one of the first legal matters concerning which he was consulted was that which is the basis of the present proceeding against him. He was 37 years of age at the time he opened his office on January 1, 1938. He further claims, and the record bears him out in this respect, that his client, Paul Kalmanovitz, was of a dominating and domineering character and strenuously insisted upon petitioner, as his attorney, proceeding in the manner shown by the record.

His claim of lack of experience principally relates to the preparation of the documents involved in the usurious transaction. He does not make the direct claim that he did not know that this transaction, if carried out in accordance with the terms of the documents as prepared by him, would be a violation of the Usury Act, but he asserts that in the prepara-

tion of these documents, he acted in good faith and in strict compliance with the orders of Kalmanovitz. We have in part answered this contention by referring to the evidence, both direct and circumstantial, that he knew the true facts which formed the basis of this transaction. He could not therefore have acted in good faith. Even though his experience in the practice was meager, he surely must have known that the preparation of instruments in such a manner as to circumvent the usury laws of the state was neither lawful nor ethical. He attempts to justify these acts and also his violation of his word given to Mr. Rucker, attorney for Newton and Redondo, by the insistence of his client. He particularly stresses the fact that after he had had his conversation with Mr. Rucker, his client insisted that he institute the action of *Koehnen* v. *Redondo* at once, and not wait until Mr. Rucker's return. We appreciate the position of an attorney attempting to act for a client with the dominating and exacting character which the evidence shows his client possessed. Nevertheless an attorney knows the limits within which he must act in conforming to the rules of professional conduct far better than his client, and no direction nor insistence on the part of his client should lead him to a violation of such rules. An attorney's word should be as good as his bond, and when the contrary is shown, it is a matter of serious consideration as to whether he should be permitted to remain any longer in the ranks of the honorable profession of the law.

Petitioner complains that this proceeding was instituted and prosecuted by Mrs. Newton and her attorney, and their action in so doing was prompted by unworthy motives, as their purpose in pursuing petitioner was actuated by a spirit of hatred and revenge, and also in the hope of eventually defeating the action of *Koehnen* v. *Redondo,* which he asserts has not yet been finally settled. In our opinion both Mrs. Newton and her attorney had just cause to feel aggrieved by the acts of petitioner as found by the local administrative committee, as hereinbefore reviewed, but aside from any consideration of the motives of those interested in this proceeding against petitioner, the facts before us compel the conclusion that petitioner's conduct respecting the controverted matters is deserving of severe censure and calls for some disciplinary action. The complaint made by petitioner has also been made in a number of like proceedings before this court, as shown by our decision in the following cases: *Peck* v. *State Bar,* 217 Cal. 47, 51 [17 P.2d 112] ; *Tapley* v.

*State Bar,* 8 Cal.2d 167, 172 [64 P.2d 404] ; *Geibel & Morfoot* v. *State Bar,* 14 Cal.2d 144, 149 [93 P.2d 97] ; *Rohe* v. *State Bar,* 17 Cal.2d 445, 450 [110 P.2d 389].

In the last named case the court stated its position on the question as follows at page 450:

"Whatever may have been the instigating factor, or whatever may have been the personal motive, in the initiation of The State Bar proceeding, are not matters of controlling concern in a case where the facts disclosed independently lead to the conclusion that the attorney is subject to some disciplinary action. There is no showing that any personal motives of individuals have generated any pressure or prejudice or have in any way prevented the petitioner from having full, fair and unbiased hearings."

As stated above, both the local administrative committee and the Board of Bar Governors recommended that petitioner be disbarred. In considering some aspects of the case against him, we see ample reasons for sustaining their action. However, as we view the whole case, we are of the conclusion that a lighter penalty will more properly meet the demands of the law. We have already referred to the fact that the case of *Koehnen* v. *Redondo* was one of petitioner's first cases as an attorney in the practice of law. We have also mentioned certain characteristics of his client, who undoubtedly was primarily responsible for the petitioner's misdeeds. We are satisfied that a lawyer of mature experience would have spurned the suggestions and demands which petitioner's client is shown to have made. While these considerations do not excuse petitioner for his violation of the ethics of his profession, they do present a condition wherein the court is justified in refusing to inflict the extreme penalty of disbarment upon petitioner. After a careful consideration of all the evidence in the case and the situation of all parties concerned in this proceeding we are of the opinion that a suspension of eighteen months would be the proper punishment to be meted out to petitioner.

It is therefore the order of this court that petitioner be and he is hereby suspended from the practice of law for the period of eighteen months beginning thirty days after the filing of this order.

EDMONDS, J., Dissenting.—In reviewing the record in this case, my associates say that the findings made by the

local administrative committee and the Board of Governors, as a whole, are amply supported by the evidence. They also say: "In considering some aspects of the case against him we see ample reasons for sustaining their action." In my opinion, as each of these statements is accurate and fair, I believe that the recommendation of disbarment unanimously made by the local administrative committee and all members of the Board of Governors present when the charges against the petitioner were considered should be sustained.

Traynor, J., concurred.